# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-3208

AARON FILLMORE,

*Plaintiff-Appellant,*

v.

THOMAS F. PAGE, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 97 844 CJP—**Clifford J. Proud**, *Magistrate Judge.*

_____

ARGUED JUNE 6, 2003—DECIDED FEBRUARY 18, 2004

_____


Before RIPPLE, KANNE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Prison authorities at Illinois's maximum security Menard Correctional Center occasionally rely on the Center's Tactical Team—familiarly dubbed the "Orange Crush," from the orange jumpsuits team members wear when performing their duties—to escort particularly dangerous inmates from one part of the prison to another. In this case, inmate Aaron Fillmore claims that he was maliciously treated by both the Crush and the officers in the Segregation Unit during a transfer to the Center's Segregation Unit. Some of his claims were handled by the court and others were resolved by a jury. At

the end of the day, he was unsuccessful across-the-board. On appeal, Fillmore has challenged nearly every aspect of the case. While we find no fault with most of what the district court did, we conclude that further proceedings are necessary on some of Fillmore's excessive force claims, and we therefore remand for that limited purpose.

## I

Our account of the facts is drawn in large part from the parties' "Stipulated Trial Testimony." In this document, which they executed after the trial of one of the defendants, they agreed on the testimony Fillmore would give about the events in question, should the remaining defendants go to trial. The "stipulation" was limited to this purpose; it was not a concession on the defendants' part that Fillmore's story was true.

On February 4, 1997, several correctional officers visited Fillmore in his cell, including Warden Thomas Page, Assistant Warden Charles Hinsley, and at least one other officer. Their visit was prompted by another prisoner's act of throwing scalding oil on two correctional officers; Fillmore had been implicated in the attack. Initially, Fillmore refused to "cuff up." This prompted a brief discussion during which Fillmore's cellmate, Jason Ramlow, asked if Page was planning to call in the tactical team—that is, the "Orange Crush"—to "break some bones." The answer was yes: the Crush had indeed been summoned to transfer Fillmore and three other inmates from the West Cellhouse to the Segregation Unit as punishment for the attack. The officers who responded were David Shemonic, James Best, Robert McCall, Richard Jack, Jason Higgins, Paul Henderson, Troy Potts, and Minh Scott. The Crush's leader was Lieutenant Andrew Wilson. Officer Keith Chamness videotaped the proceedings, a practice designed to protect guards and prisoners alike. The Crush assembled

Fillmore and three other inmates. The team, accompanied by Page and the videographer, then escorted Fillmore and the others through the corridors of the prison and the prison yard to the Segregation Unit.

As they approached the West Cellhouse with the other members of the Crush, Wilson allegedly announced, "You all have had it now." Midway through the transfer, Page commented, "You fucked up," to one of the inmates. Throughout the transfer process, according to Fillmore, Henderson held a baton with one end on top of the chain portion of the handcuffs between Filmore's wrists and the other between his legs. Henderson was thereby able to apply continuous downward pressure on Fillmore's wrists, and continuous upward pressure on his groin. Jack also had his hands on Fillmore during the transfer to the Segregation Unit. Fillmore alleges that upon his arrival at the Segregation Unit, one of the officers pushed his face against the bars of a caged area immediately outside the Segregation Unit, although he cannot identify which officer did so. Fillmore was then taken inside a vacant cell and was strip-searched by Higgins in the presence of several of the defendants. Higgins examined each of the usual body locations five times.

After the strip search, Fillmore was transferred to yet another cell within the Segregation Unit. This part of the transfer is the basis of a further set of allegations in the complaint and stipulated testimony. On the way to the cell, Fillmore claims, Officer Derek Cleland tripped him and banged his shoulder into a "crank box." Upon reaching the cell, rather than waiting to uncuff Fillmore until he was safely locked inside the cell, Cleland uncuffed Fillmore outside the cell and then shoved him into the cell and onto the floor and began kicking and punching him. Fillmore immediately assumed the fetal position in an attempt to ward off the assault, but he saw at least two orange-clad legs joining in the beating. Later that night, several

officers—perhaps Segregation Unit Officers Dennis Grah, Christopher McCabe, William Dillon, and Steven Mifflin, although Fillmore is uncertain—allegedly sprayed freezing water into his cell, broke the light in his cell, and turned off the water to the sink and toilet.

On October 3, 1997, Fillmore filed suit, naming 17 defendants and advancing various federal- and state-law claims. All defendants moved to dismiss, and Fillmore responded in opposition. The magistrate judge issued a report on February 23, 2000, which the district court adopted in full in an order entered on July 31, 2000. In that order, the court dismissed Fillmore's claims based on deliberate indifference to serious medical needs and conditions of confinement, which left only his Eighth Amendment excessive force claims for further development. The court also dismissed Fillmore's supplemental state-law claims, which mirrored the medical needs and confinement claims. Three days later, on August 3, 2000, the case was transferred by consent of the parties to Magistrate Judge Proud for disposition on the merits. See 28 U.S.C. § 636(c).

On July 10, 2000, the Segregation Unit defendants (Grah, McCabe, Dillon, and Mifflin) filed a motion for summary judgment on the excessive force claims against them. On February 26, 2001, Magistrate Judge Proud responded to this motion, clarifying the July 31 order and noting that the district court had already dismissed the medical needs and conditions of confinement claims. Those dismissals mooted the motion for summary judgment filed by this group of defendants, as no claims relating to their alleged conduct—that is, the spraying of cold water and the sabotage of the light and water in Fillmore's cell—remained in the case.

On March 14, 2001, Fillmore filed a motion to reconsider the February 26 dismissal. Two weeks later, the district court granted the motion to reconsider, vacated its order, and revived the July 10 summary judgment motion

brought by Grah, McCabe, Dillon, and Mifflin. The net effect, however, was not terribly helpful from Fillmore's perspective. This time around, the court found that Fillmore had not pointed to enough evidence to justify a trial on his excessive force claims against the Segregation Unit officers, and they were (again) dismissed from the case.

On April 25, 2002, the court issued an order severing the trial of Page and Cleland from that of the remaining defendants. The Page-Cleland trial began on June 18, 2002. At the conclusion of Fillmore's presentation of his case-in-chief, Page moved for judgment as a matter of law. Ruling from the bench, the court granted that motion, dismissing Page from the case based on the lack of evidence that Page ordered any of the alleged abuse, or that he failed to intervene during the parts of the transfers for which he was present. The case against Cleland proceeded to the jury. On June 20, 2002, the jury returned a verdict in favor of Cleland on all counts.

On July 1, 2002, the Orange Crush defendants moved for an entry of judgment in their favor. While that motion was under consideration by the court, the parties submitted the "Stipulated Trial Testimony" described above. On July 26, 2002, the court entered judgment in favor of all ten defendants (Wilson, Chamness, Shemonic, Best, McCall, Jack, Higgins, Henderson, Potts, and Scott), construing the defendants' July 1 motion as a motion for judgment pursuant to FED. R. CIV. P. 52. This appeal followed.

## II

Fillmore's claims are directed against three different groups of defendants: those who had actual physical contact with him during the transfer, those whom he accused of either ordering or failing to intervene in the abuse, and the unnamed members of the Orange Crush who allegedly perpetrated various forms of abuse, but who Fillmore is unable to identify. We treat each set in turn.

**A**

We begin with those defendants who had actual physical contact with Fillmore during the transfer and were thus accused of perpetrating actual abuse, as opposed to merely failing to intervene or ordering that abuse. These defendants include Henderson, who led Fillmore from the West Cellhouse to the Segregation Unit; Jack, who also admitted to having his hands on Fillmore during the transfer; and Higgins, who conducted the strip search of Fillmore in the holding cell upon arrival at the Segregation Unit.

The first question we must address is what standard of review is proper for these rather unusual proceedings. The judgment in favor of Henderson, Jack, and Higgins was based in part on the "Stipulated Trial Testimony" document. The parties submitted this document at the conclusion of Cleland's trial, along with a request that the court address the remaining claims on the record from the first trial, rather than in a full-blown second trial. The magistrate judge agreed to their proposal and concluded that this meant that he was operating under FED. R. CIV. P. 52(c). That rule applies to bench trials and authorizes the judge, after hearing all of the evidence with respect to an issue, to make findings of fact and enter judgment as a matter of law against that party. *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 656 (7th Cir. 2001); *Int'l Union of Operating Eng'rs, Local Union 103 v. Ind. Const. Corp.*, 13 F.3d 253, 257 (7th Cir. 1994).

But the use of Rule 52(c) is proper only if the parties have agreed to waive their right to a jury trial. See FED. R. CIV. P. 39(a); *Lovelace v. Dall*, 820 F.2d 223, 227 (7th Cir. 1987). The problem here is that no such waiver is memorialized anywhere within the document containing the stipulated testimony, nor does the record on appeal include any hearing in which a waiver occurred.

Our review of the pleadings indicates that neither party anticipated at that point that the court might proceed under Rule 52(c). Shortly after the Cleland trial, the remaining defendants moved for judgment as a matter of law, presumably under Rule 50(a). For his part, Fillmore was apparently confused about what procedural mechanism would apply to the court's disposition of the case against the remaining defendants. The opening paragraph of Fillmore's "Plaintiff's Brief in Opposition to Directed Verdict" notes that entry of judgment "pursuant to Rule 50(a) of the Federal Rules of Civil Procedure is not supported by the law or the stipulated evidence." But there was a bigger problem than that with the use of Rule 50(a): by its terms, it applies only to jury trials. *Rego v. ARC Water Treatment Co.*, 181 F.3d 396, 401 (3d Cir. 1999). Because none of the defendants who remained in the case had yet gone to trial, Rule 50(a) had no role to play.

Nevertheless, parties can waive the right to jury trial by conduct just as they can by written or oral statements. In our view, that is what happened here. A failure to object to a proceeding in which the court sits as the finder of fact "waives a valid jury demand as to any claims decided in that proceeding, at least where it was clear that the court intended to make fact determinations." *Lovelace*, 820 F.2d at 227 (citing *United States v. 1966 Beechcraft Aircraft*, 777 F.2d 947, 951 (4th Cir. 1985) (collecting cases)); *Stewart v. RCA Corp.*, 790 F.2d 624, 630 (7th Cir. 1986). Fillmore's decision to submit stipulated testimony for use in further proceedings and his participation in the request to dispense with a second trial can be understood only as an invitation to the judge to resolve matters without the aid of a jury. This is enough to invoke Rule 52 and its associated standards of review for this court.

Fillmore is therefore incorrect when he argues that "the facts were stipulated to by the parties" and that the trial court "made no factual findings." This misunderstands

both the scope of the Stipulated Testimony and the implications of his actions. As we have already noted, the document containing the "stipulated" testimony is not a stipulation of facts in the traditional sense, but merely a recitation of the parties' testimony about particular matters in the event of a trial. Indeed, the document makes explicit that the promised testimony as to any particular issue does *not* reflect agreement among the parties. It was up to the district court to resolve factual disputes and to decide who should prevail. This court, under Rule 52(c), then reviews the district court's legal conclusions *de novo* and its fact-findings for clear error. *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).

Applying that standard of review, we now turn to the merits of Fillmore's Eighth Amendment excessive force claims against Henderson, Jack, and Higgins. The central question is " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). In making that determination, several factors are relevant, including the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate. *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 1999). Such a claim cannot be predicated on a *de minimis* use of force. *Id.* at 620. Instead, the quantum of force required for a constitutional violation is that which is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10 (quoting *Whitley*, 475 U.S. at 327). In addition, in order to survive a motion for summary judgment, the prisoner must have evidence that "will support a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322. Infliction of pain that is "totally without penological justification" is *per se* malicious.

*Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

Two questions are thus important: first, whether the force that Fillmore describes rose above the *de minimis* level and thus potentially amounted to an Eighth Amendment violation, and second, whether the actions of any of the three defendants were designed expressly for the purpose of punishing or humiliating Fillmore. The magistrate judge concluded that any force exerted by Henderson and Jack was *de minimis* and was not so egregious as to "shock the [conscience] of mankind." The judge came to the same conclusion about the strip search conducted by Higgins.

On this record, and bearing in mind that we are operating under clear error review, we find no reason to overturn the district court's decisions. Counsel for Fillmore told us at oral argument that not more than 30 minutes separated the scalding oil attack on the correctional officers and the transfer of Fillmore and the other inmates to the Segregation Unit. We acknowledge that this might seem to provide a strong motive for the officers to mete out "rough justice" against Fillmore and the other inmates. Even so, our own careful review of the video record (on which the magistrate judge also relied) and the record testimony indicates that the court's conclusion that the force applied by Henderson and Jack was *de minimis* was not clearly erroneous.

As the district court noted, the video reveals only incidental bumping, which is not enough to meet the constitutional threshold for excessive force. See *DeWalt*, 224 F.3d at 620 (shove insufficient to meet constitutional threshold); see also *Outlaw v. Newkirk*, 259 F.3d 833, 839 (7th Cir. 2001) (finding no Eighth Amendment violation when use of force caused superficial injury to prisoner's hand); *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (finding that *de minimis* force was used when prison guard caused bucket to hit prisoner on the head). Moreover, while the

video does not capture every second of every aspect of the
transfer, it is fairly comprehensive. The portions showing
Fillmore do not suggest that he was experiencing the level
of discomfort that one would expect if the officers were
applying substantial upward pressure to Fillmore's groin
using the baton. Finally, as the district court also noted,
Fillmore pointed to no significant injury or need for medical
attention. Fillmore's mother testified only that she noticed
a bruise on his back during a later visit. This was certainly
not like the beating that was perpetrated during an intra-
prison transfer in *Hudson*, which resulted in, among other
things, a broken dental plate. 503 U.S. at 4. Nor does this
case involve the kind of suffering that accompanies the use
of the hitching post, recently invalidated in *Hope*. 536 U.S.
at 738. At most, Fillmore experienced discomfort and sore
wrists. The district court's finding that the force applied did
not violate the Constitution was not clearly erroneous.

The district court also found that Fillmore's rights
were not violated in the course of the strip search Higgins
conducted. Strip searches are not *per se* unconstitutional.
*Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th
Cir. 1998). Fillmore could recover if he could show that
the strip search was "conducted in a harassing manner
intended to humiliate and inflict psychological pain."
*Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); see
also *Peckham*, 141 F.3d at 697; *Meriwether v. Faulkner*, 821
F.2d 408, 418 (7th Cir. 1987). According to Fillmore, that is
exactly what Higgins did when he forced Fillmore to spread
his buttocks five different times in quick succession. The
district court, however, found that the search was not
conducted in a humiliating manner, and we must review
that finding for clear error.

Once more, the video record is of some assistance. It re-
veals that the strip search of Fillmore was conducted in
a discreet and expeditious manner. The search took place
inside a holding cell and so was out of view of the other in-

mates. It was therefore not an affront to Fillmore's privacy interests vis-à-vis other guards or his fellow inmates, to the extent a prisoner may assert such interests. See *Hudson v. Palmer*, 468 U.S. 517, 526-30 (1984); *Johnson v. Phelan*, 69 F.3d 144, 146-47 (7th Cir. 1995). Further, Fillmore was given ample time to undress and dress, and the total examination portion of the search does not appear to have lasted more than a few seconds. The principal injury Fillmore claimed was humiliation: nowhere did he allege that the strip search was conducted in a violent manner. While the absence of physical injury does not necessarily preclude an Eighth Amendment claim directed at an excessive strip search, *Calhoun*, 319 F.3d at 939, the district court did not clearly err in concluding that this search involved a *de minimis* application of force and lacked the requisite showing of malice.

## B

We turn next to the claims against the defendants who did not have any actual physical contact with Fillmore, but were nonetheless present: Chamness, who operated the camera during the transfer, Wilson, who heads up the Orange Crush, and Page. Fillmore claims that a jury could have found that each defendant failed to intervene when he had a duty and opportunity to do so, or otherwise ordered subordinates to commit the alleged abuse. That is not, however, the right question to ask. Our review of the judgments in favor of Chamness and Wilson once again comes from Rule 52, and it is limited to clear error. Page's situation is different: because he won judgment as a matter of law under Rule 50, our review of his part of the case is *de novo. Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999). Under the latter standard, the decision in favor of Page is proper only if the evidence, taken in the light most favorable to Fillmore, nonetheless compels a finding

for the defendant. *Jones v. W. & S. Life Ins. Co.*, 91 F.3d 1032, 1036 (7th Cir. 1996).

In bringing his claims against Chamness, Wilson, and Page, Fillmore relied in particular on *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000). In that case, we said that "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so" could be held liable under § 1983. *Id.* at 495; see also *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (collecting other cases). This language merely reiterates the long-established rule that "[a]n official satisfies the personal responsibility requirement of § 1983 if she acts or *fails* to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (emphasis added). The problem for Fillmore, however, is the fact that there was no underlying violation of his constitutional rights committed by Henderson, Jack, or Higgins. *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981). Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention.

Even if there were such a violation, the closest that Fillmore comes to hard evidence that Page and Wilson ordered or even condoned the alleged use of force are the statements each one allegedly made, including Wilson's announcement that "You have had it now" upon the arrival of the Orange Crush at Fillmore's cell, and Page's statement that "You fucked up" (audible on the video) during the actual transfer of the inmates. But offhand and isolated statements are too slim a reed to support the contention that Page or Wilson affirmatively directed anyone else to harm Fillmore, or failed to intervene with a deliberate or reckless disregard for Fillmore's constitutional rights. Fillmore has not presented enough to compel reversal of the

magistrate judge's entry of judgment under either Rule 50 (Page) or 52 (Wilson).

The same is true of the remaining defendants, including videographer Chamness, as well as Shemonic, Best, McCall, Potts, and Scott, who were near Fillmore throughout the transfer. The district court held that the mere presence of these officers throughout the transfer did not establish a violation because presence without more falls short of a deliberate or reckless disregard of Fillmore's constitutional rights. We agree. In the absence of evidence of either an underlying rights violation or a conspiracy on the part of the remaining guards, we affirm the court's entry of judgment in favor of Chamness, Shemonic, Best, McCall, Potts, and Scott.

## C

We turn finally to a review of the district court's dismissal of Fillmore's claims against certain unidentified members of the Orange Crush. Our review on this part of the case again proceeds under Rule 52.

Fillmore's allegations against these defendants rest on two separate alleged incidents. The first occurred when Fillmore arrived at the Segregation Unit and at least one unidentified defendant pushed his face into the bars of the caged area just outside the Unit. (Fillmore suspects that either Henderson or Jack was the responsible party, but he does not know for sure.) The second involved a beating administered by Cleland and at least two other members of the Crush (identifiable only by their orange pantlegs), which occurred after Fillmore was taken to his holding cell in the Segregation Unit. The district court's order says nothing about the first incident, and it summarily rejected the second claim, noting that neither Fillmore, "*nor anyone else*, can specifically identify any of the ten defendants as being present." (Emphasis added.) Fillmore now argues that

the court erred by rejecting his claim against the unidentified defendants in too summary a fashion.

Fillmore's principal strategy is to allege a far-flung conspiracy to inflict punishment on him for his suspected role in the attack on the guards, and then to rely on the common law doctrine of joint liability to overcome his inability to identify exactly who was beating him. He begins with the well-established proposition that § 1983 creates a "species of tort liability," *Carey v. Piphus*, 435 U.S. 247, 253 (1978). In tort law, when each of two defendants performed a negligent act that may have produced the plaintiff's injury, but it is impossible to know which one really did, courts hold that the two defendants may be jointly liable for that single injury. See, *e.g.*, *Summers v. Tice*, 199 P.2d 1 (Cal. 1948) (holding two hunters jointly liable for a hunting accident where each negligently discharged his weapon). This case, according to Fillmore, is a perfect candidate for application of that rule in the § 1983 context.

But Fillmore has pushed the concept too far. In his case, questions exist whether the other potential tortfeasors were present at all. His case is more like *Hessel v. O'Hearn*, 977 F.2d 299 (7th Cir. 1992). There, the plaintiffs brought a § 1983 action when a can of soda vanished during a search of their apartment. We held that plaintiffs' inability to identify the particular officer who stole the soda was fatal to their claim, but suggested that the result might have been different if the evidence had shown that each defendant was involved in the actual wrongdoing. *Id.* at 305. We explicitly distinguished the hunting accident at issue in *Summers v. Tice*, noting:

> Those officers who participated in the search but did not steal any of the Hessels' property are innocent in a way in which the defendants in *Summers* and *Sindell* [*v. Abbott Labs.*, 607 P.2d 924 (Cal. 1980)] were not—for all of those defendants had done a harmful, a dangerous

thing, albeit not all had harmed the particular plaintiff.

*Id.* Joint liability is appropriate only where all of the defendants have committed the negligent or otherwise illegal act, and so only causation is at issue. Fillmore has not established the predicate for the joint liability rule, and thus his claim cannot succeed on this basis.

This does not, in our view, mean that prison guards who take the trouble to disguise themselves beyond recognition are free to abuse inmates without fear of liability. It is simply to say that the solution to that problem does not, in the present circumstances, lie in the doctrine of joint individual liability. Other measures may also be effective. Menard's own practice of videotaping transfers is one, to the extent that the camera captures all relevant events. Another would be to require clearly identifiable numbers on the outerwear of the guards, through which the institution could trace the particular individuals involved. A third, well within judicial competence and more suited to the litigation context, is to compel prison officials to reveal all information relevant to the task of identifying the responsible parties, including such facts as who was assigned to the particular task that gave rise to the claim. Refusals to testify or dishonest testimony must be punished with sanctions severe enough to compel cooperation. No one wants to reward reliance on the legendary code of silence among law enforcement officers, see, *e.g.*, *Sledd v. Lindsay*, 102 F.3d 282, 287 (7th Cir. 1996), and so the courts must be vigilant to ensure that the proper information sees the light of day. Indeed, in this case, the trial court imposed discovery sanctions on October 15, 1999, in response to the defendants' failure to provide the names of the officers on duty in the Segregation Unit the night after the transfer, but nothing more seems to have been done.

What, then, can we make of Fillmore's effort to bring this excessive force claim? It is important initially to distinguish

between two possible situations: first, that the unknown officers administering the beating were among the individuals Fillmore sued, and second, that they were not (*i.e.*, that they were additional Tactical Team members who had never been named as defendants and served with process). If the latter proves to be true, then Fillmore is probably out of luck. These events took place in 1997, well outside the two-year limitations period that applies to Illinois § 1983 claims in the absence of any kind of tolling. *Licari v. City of Chicago*, 298 F.3d 664, 667-68 (7th Cir. 2002). If the former is true, however, then the defendants are already properly before the court, and the only task is the collection of the right information. What this record currently lacks is a finding of fact about which, if any, of the defendants pressed Fillmore's face up against the bars outside the Segregation Unit, and whether Fillmore was really beaten upon his arrival at the cell in which he was ultimately housed.

The court should have made a finding of fact about whether each incident occurred and, if possible, who was involved, rather than rejecting Fillmore's claim as a matter of law based solely on *Fillmore's* inability to identify his assailants without judicial intervention. We are not convinced that a thorough enough inquiry was made into these matters, and we therefore conclude that this portion of the case must be remanded for further proceedings. Should the court determine that either incident took place, then the defendants must cooperate fully with inquiries designed to identify which officers were involved. In addition, if either incident is found to have taken place, then Fillmore may also proceed against any defendants who the court finds were present at the scene for their failure to intervene. If, in the final analysis, the court concludes that the prison has a policy that makes identification virtually impossible, it may be that Fillmore will have highlighted a different kind

of problem relating to the broader policies the prison officials have adopted in their official capacities.

## III

Fillmore next attacks the instructions presented to the jury in Cleland's trial. We review jury instructions to determine if, taken as a whole, they were sufficient to inform the jury correctly of the applicable law. *Dadian v. Village of Wilmette*, 269 F.3d 831, 839 (7th Cir. 2001).

Fillmore's principal argument is that the jury instructions incorrectly required the jury to find that Officer Cleland subjectively desired to cause him pain. The instructions at issue stated, in relevant part:

> Defendant's Instruction 11: . . . The infliction of pain in a prison security measure does not amount to a cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence, unnecessary in a strict sense.

> In determining whether the use of force by a correctional officer against a prisoner constitutes cruel and unusual punishment, you must decide whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

> Defendant's Instruction 12: "Maliciously" means intentionally injuring another without just cause or reason.

> Defendant's Instruction 13: "Sadistically" means engaging in "extreme cruelty or delighting in cruelty."

We find no reversible error in the way that these instructions present the subjective element of the plaintiff's claim. In *Thomas v. Stalter*, 20 F.3d 298 (7th Cir. 1994), we noted:

Under the controlling precedent of the Supreme Court, the test for determining whether a prisoner has suffered cruel and unusual punishment has two components, one objective and one subjective. The objective component focuses on whether, in light of contemporary standards of decency, the alleged deprivation was sufficiently serious. The subjective component involves an inquiry into whether the officials acted with a sufficiently culpable state of mind.

*Id.* at 301 (citations and quotation marks omitted). Fillmore thinks that the Supreme Court changed this test in its recent decision in *Hope v. Pelzer*, *supra*, but we disagree. It is true, as Fillmore notes, that in holding that Alabama's use of the hitching post violated the Eighth Amendment, the Court nowhere mentioned any proof that the guards involved were motivated by any subjective intention of inflicting pain on Hope. In fact, the Court underscored that it was not altering the subjective intent requirement for Eighth Amendment cases when it stated that "[w]e may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope*, 536 U.S. at 738. The instructions here provide no reason to upset the jury's verdict in favor of Cleland.

## IV

Last, Fillmore objects to the process by which the district court granted summary judgment for defendants Grah and Mifflin. (He concedes that judgment was properly entered for McCabe and Dillon.) The district court, he claims, failed to give him an adequate opportunity to complete discovery or file evidence in opposition. The magistrate judge's decision to revive and grant an earlier motion for summary judgment, all in a single order, in Fillmore's view violated FED. R. CIV. P. 56(c)'s command that "[t]he [sum-

mary judgment] motion shall be served at least 10 days before the time fixed for the hearing."

Strictly speaking, the advance notice and response provision of Rule 56(c) requires that ten days elapse before the hearing, not ten days before the filing of affidavits or other materials in opposition, but we have interpreted it to mean that a district court has no power to enter summary judgment without first allowing the nonmovant at least ten days (or whatever additional period of time the court has set) to file an opposition. *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 702 F.2d 107, 111 (7th Cir. 1983); see also *Grigoleit Co. v. United Rubber, Cork, Linoleum, & Plastic Workers of Am., Local No. 270*, 769 F.2d 434, 437 (7th Cir. 1985); *Gieringer v. Silverman*, 731 F.2d 1272, 1280 (7th Cir. 1984); *Lewis v. Faulkner*, 689 F.2d 100, 101 (7th Cir. 1982); *Allen v. Beneficial Fin. Co.*, 531 F.2d 797, 799 (7th Cir. 1976). Relying on this authority, Fillmore now claims that the magistrate judge violated the notice and response provision of Rule 56(c) when he revived and granted the defendants' summary judgment motion in one fell swoop, without providing Fillmore with an additional ten days to prepare a response after the court's decision to revive that motion.

The Fifth Circuit has held that a significant delay between the time a motion for summary judgment is filed and the court's ultimate disposition of that motion violates Rule 56(c). See *Capital Films Corp. v. Charles Fries Prods., Inc.*, 628 F.2d 387 (5th Cir. 1980); *Kilbort v. Hampton*, 538 F.2d 90 (5th Cir. 1976); *Enochs v. Sisson*, 301 F.2d 125 (5th Cir. 1962). This court, however, has taken a more flexible approach. In *Grigoleit*, the plaintiff had inexplicably failed to file any response to the defendant's motion for summary judgment over a period of several months. When the district court entered summary judgment in favor of the defendant, the plaintiff balked, claiming that FED. R. CIV. P. 56(c) requires "a court to notify the opposing party ten days

before ruling on the motion, even if the motion were filed six months earlier." *Grigoleit*, 769 F.2d at 437. We rejected that reading of the rule and held that the district court could enter summary judgment at any point without providing ten days' notice to the delinquent party of its intention to do so. *Id.* We distinguished *Capital Films* on the ground that in that case the district court's entry of summary judgment contradicted its earlier assurances to the parties that it would *not* act on the summary judgment motion and that the case would instead proceed to trial. *Id.*

In this case, the magistrate judge answered Fillmore's first motion for an extension of discovery with an order extending both the discovery *and* the dispositive motion deadlines to October 4 and 11 respectively. But while Fillmore had thereby bought himself some more time, he did not at the same time receive an extension of time for responding to the summary judgment motion. A savvier plaintiff might have thought to file a motion that asked for both kinds of extension, rather than just an extension of the discovery cut-off, but Fillmore did not. As the October 11 deadline approached and the court had not yet disposed of his October 2 motion requesting a further extension of discovery, the safest course for Fillmore was to file an opposition anyway, along with an affidavit outlining his reasons for needing further discovery as contemplated by Rule 56(f). See *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000); *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 (7th Cir. 2000); *Farmer v. Brennan*, 81 F.3d 1444, 1449-50 (7th Cir. 1996); *Wallace v. Tilley*, 41 F.3d 296, 302 (7th Cir. 1994). But Fillmore did not do so, then or later. As a result, the court's October 11 deadline had come and gone well before the confusing sequence of orders entered in February and March, in which the court declared the remaining claims against the Segregation Unit defendants to be moot, but then vacated that order and revived and granted those same defendants' motion for summary judgment.

Looking at the proceedings as a whole, and bearing in mind the district court's discretion in managing cases before it, we conclude that Fillmore had a meaningful opportunity to respond to the defendants' summary judgment motion. We therefore affirm the district court's entry of summary judgment in favor of Grah and Mifflin.

## IV

Out of this entire appeal, therefore, we have AFFIRMED the judgments in favor of Henderson, Jack, Higgins with respect to the claims arising out of the transfer; the judgment in favor of Higgins with respect to the strip search; the claims against Wilson, and Page with respect to failure to intervene; the claims against Chamness, Shemonic, Best, McCall, Potts, and Scott for their action or inaction during the transfer; the jury verdict in favor of Cleland; and the summary judgments for Grah and Mifflin. We REVERSE and REMAND the court's dismissal of Fillmore's claims against the unnamed defendants who allegedly beat him in the Segregation Unit for further proceedings to ascertain whether any of the named defendants was involved in the beating, and if the specific actors can be identified, for further proceedings on that claim. If other persons administered the beating, the court must decide whether the statute of limitations bars Fillmore's claims against any or all of them. Each party shall bear its own costs on appeal.

A true Copy:

     Teste:

                        _____
                        *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*