In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 14-3438 & 14-3494

ROBERT P. HILLMANN,

*Plaintiff-Appellee/*
*Cross-Appellant*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellant/*
*Cross-Appellee*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 C 6671 — **Rubén Castillo**, *Chief Judge*.

_____

ARGUED SEPTEMBER 17, 2015 — DECIDED AUGUST 23, 2016

_____

Before FLAUM, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. For nearly three decades, Robert Hillmann worked for the City of Chicago in its Department of Streets and Sanitation. In July 2002 the City eliminated his position in a citywide reduction in force ("RIF"). Two years

later he sued the City alleging that he was targeted for inclusion in the RIF because he asserted his rights under the Illinois Workers' Compensation Act ("IWCA"), 820 ILL. COMP. STAT. 305/1 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

This long-running case twice proceeded to trial. In the first trial, a jury found for the City on the IWCA retaliatory-discharge claim. For reasons not entirely clear to us, the ADA claim was tried to the court at the same time. But the judge died before issuing a decision, and a successor judge ordered a new trial on both claims based on an evidentiary error. The second trial yielded a split result. The jury found in Hillmann's favor on the IWCA claim and returned a seven-figure damages verdict. The judge found for the City on the ADA claim.

Both sides appealed. The City contends that the judge's new-trial order was improper and asks us to reinstate the first jury's verdict. Alternatively, the City argues that the IWCA claim fails as a matter of law because Hillmann produced no evidence of causation. As a fallback argument, the City seeks a new trial limited to damages. Hillmann's cross-appeal asks us to reverse the judge's bench decision rejecting his ADA claim.

We decline the City's invitation to second-guess the successor judge's decision to order a new trial. The first judge had excused two of the City's managerial employees from testifying based on their invocation of the Fifth Amendment; the second judge reasonably questioned the breadth of that ruling. Regardless, we agree with the City on the merits: *Neither* of these claims should have been tried. To prevail on his claim that he was discharged for exercising his rights

under the IWCA, Hillmann needed to prove causation. At a minimum this required proof that the relevant decision-maker knew about his workers' compensation claim. But no evidence suggests that the RIF decision-maker knew about Hillmann's claim. The ADA claim likewise fails for lack of proof of causation. Hillmann has no evidence that the City withheld merit raises or targeted him for the RIF based on his request for an ADA accommodation. The City is entitled to judgment across the board.

## I. Background

Hillmann began working for the City of Chicago's Parks District in 1973. About five years later he moved to a job as a truck driver in the City's Department of Streets and Sanitation. In 1984 he developed cervical radiculopathy, a work-related injury that caused pain, weakness, limited mobility, and loss of sensation in his right arm. In 1995 he entered into an accommodation agreement with the City that allowed him to avoid repetitive work with his injured right arm. As part of this agreement, Hillmann was reassigned to the position of chief timekeeper in the Bureau of Electricity, a division of the Streets and Sanitation Department. He never performed all of the timekeeping duties required by the job description, but he performed the essential functions and did other tasks as directed by his supervisor.

Hillmann's supervisor during this time was Deputy Commissioner Jim Heffernan. In May 2000 Heffernan was reassigned to a different post and Bart Vittori was temporarily assigned to run the Bureau. Vittori gave Hillmann additional duties that required repetitive use of his injured right arm, but Hillmann did not immediately inform Vittori of his physical restrictions. Instead, he went to Heffernan

and Hugh Donlan, the Bureau's personnel liaison to the Department. Heffernan told Hillmann that he was no longer in charge and couldn't help. For the next two months, Hillmann performed the additional tasks Vittori assigned to him, exacerbating his condition.

On July 1, for the first time in his career, Hillmann did not receive a merit raise. On August 8 Hillmann finally went to Vittori and told him that he could not physically perform the additional duties he was assigned. In response Vittori reassigned a supervising timekeeper to other responsibilities and assigned the supervisor's duties to Hillmann. About ten days passed before this shift of responsibilities could be accomplished, however, so Hillmann reported for work but performed no tasks.

On August 15 Hillmann's attorney sent a letter to Barbara Smith in the City's Corporation Counsel's office requesting that Hillmann's 1995 accommodation agreement be honored. The next day Smith discussed the matter with Catharine Hennessey, the Department's labor-relations liaison. In response Hennessey instructed Donlan to write a new job description for Hillmann. The first paragraph of the description covered the duties Hillmann had performed as chief timekeeper; the second paragraph covered the reassigned duties of a supervising timekeeper. This paragraph also anticipated the Department's planned implementation of the Kronos computerized payroll system. Hillmann testified that the second paragraph of his new job description included tasks that he could not physically perform.

On August 16 Brian Murphy replaced Heffernan as Deputy Commissioner. In that role Murphy was responsible for supervising all Bureau of Electricity employees.

Murphy's direct supervisor was John Sullivan, the Managing Deputy Commissioner of the Department of Streets and Sanitation.

On August 23 Hennessey instructed Hillmann to report for a fitness-for-duty medical examination to reassess the question of his accommodation. During this time, Hillmann also saw his own physician, who noted that his condition had worsened. On September 1 Hillmann was transferred to the Construction Division of the Bureau of Electricity where he was assigned to answer phones. That same day Hillmann filed a workers' compensation claim with the Illinois Industrial Commission. On October 1 another merit raise was denied. On October 7 he was again transferred within the Bureau, this time to the Transportation Division, where he was assigned to answer phones.

Throughout the late summer and fall, Hillmann continued to see his treating physician and was examined by medical professionals in connection with his workers' compensation claim. On December 21 Hillmann received a letter signed by Hennessey and delivered by Donlan acknowledging his inability to perform the tasks in his new job description and advising him that "the most viable option for you is to apply for a Leave of Absence[] and to return to work when your physical condition allows you to perform the duties of your job title." The letter also suggested that Hillmann could "request a Work Evaluation from the Department of Personnel to determine if your physical restrictions will allow you to perform in some other capacity in another job title." Hillmann testified that when Donlan gave him the letter, he advised him not to report to work. Hill-

mann stopped reporting for work but did not apply for a leave of absence.

For the next two months, Hillmann underwent further medical evaluations in connection with his workers' compensation claim. In January 2001 he was referred to Dr. Damon Arnold, director of occupational health at Mercy Works, an agency the City consults with on workers' compensation matters. On February 26, 2001, Dr. Arnold issued a "discharge sheet" clearing Hillmann to perform sedentary work with limited use of his right upper arm—in other words, a desk job with minor office work. The discharge sheet was sent to Jack Drumgould, the Department's Assistant Commissioner in charge of personnel. Drumgould wrote the following on the discharge sheet: "Cannot accommodate with restrictions" but "CAN accommodate in Bureau of Traffic Services with restrictions as of 3–02–01."

Cleared to return to work, Hillmann reported to Drumgould and was "detailed" to the Bureau of Traffic Services. A "detail" is just a temporary work assignment; Hillmann remained an employee of the Bureau of Electricity with the title of chief timekeeper. When Hillmann showed up for work in the Bureau of Traffic Services, he was directed to the auto pound where he was verbally assigned minor, menial duties. In this assignment he racked up a pattern of tardiness and absenteeism due to sick leave. In the late spring he applied for and was granted a transfer from the 8 a.m.-to-3 p.m. shift to the noon-to-8 p.m. shift. He was denied merit raises in January 2002, March 2002, and May 2002.

In 2002 the City faced a serious budget shortfall necessitating a citywide RIF. Each department was given a target

for reducing its workforce, and department heads were directed to identify which positions to include in the RIF and submit a list to the Office of Budget and Management. Sullivan was the Department's main contact for its RIF list, but Al Sanchez, the Streets and Sanitation Commissioner, made the final decision about which departmental positions would be included.

Murphy prepared a preliminary list of positions he thought could be eliminated from the Bureau of Electricity without damaging the delivery of services. He included the chief timekeeper and supervising timekeeper positions because no one was then performing those functions and the Department was completing its transition to Kronos, a computerized payroll system, making these positions obsolete. Jack Kenney, the Department's Deputy Commissioner of Administration, reviewed Murphy's preliminary list and agreed with the recommendation to include the timekeeping positions in the RIF. Kenney approved the list and sent it up the chain of command. Sullivan, in turn, reviewed the list and recommended that Sanchez approve it. Sanchez, the final authority, reviewed and approved the list and sent it to the Office of Budget and Management. Sanchez did not know that Hillmann had filed a workers' compensation claim.

On July 1, 2002, Hillmann received a letter from Sanchez notifying him that he was being placed on administrative leave until further notice and that his chief timekeeper's position would be eliminated effective July 31, 2002, as a part of the citywide RIF.

**A. The First Trial**

In 2004 Hillmann filed suit in state court alleging that the City violated his rights under the First Amendment, the ADA, and state law. The City removed the case to federal court, and Judge William J. Hibbler was assigned to preside. A long period of discovery and motions litigation followed. Judge Hibbler eventually allowed two claims to move forward to trial: (1) Hillmann's claim that he was discharged in retaliation for exercising his rights under the IWCA, and (2) his claim that he was denied merit raises and discharged because of his request for an ADA accommodation.

During discovery, Sullivan and Drumgould invoked their Fifth Amendment privilege and refused to testify in deposition, citing potential criminal exposure in connection with a political-patronage scandal involving the Department of Streets and Sanitation. The City moved in limine to preclude their testimony and any reference to their Fifth Amendment invocation at trial. Judge Hibbler held a hearing on the motion, with counsel for the two witnesses present to address the claim of privilege. After hearing from all parties, Judge Hibbler granted the City's motion, excused the two witnesses from testifying, and ruled that the issue could not be raised in front of the jury.

The City also moved in limine to exclude Hillmann's pension-damages expert, arguing that his testimony was irrelevant because Hillmann was not entitled to pension damages. In the alternative the City sought to exclude the expert's testimony as unreliable and based on improper calculations. Judge Hibbler granted this motion as well but offered no reasons.

The case proceeded to trial in June 2011. The judge submitted the IWCA retaliatory-discharge claim to the jury, which returned a verdict for the City. The jury was not asked to decide the ADA claim (we're not sure why), so that part of the case was converted to a court trial and Judge Hibbler took the matter under advisement. He died before issuing a decision.

### B. The Second Trial

Chief Judge Rubén Castillo assumed responsibility for the case after Judge Hibbler's death. Hillmann moved for a new trial, arguing that it was error to excuse Sullivan and Drumgould from testifying based on their blanket assertions of the Fifth Amendment privilege. Chief Judge Castillo agreed and granted the motion. He also revisited and reversed Judge Hibbler's decision to exclude the testimony of Hillmann's pension-damages expert.

The two claims were retried in April 2013. Sullivan and Drumgould testified, as did Hillmann's pension-damages expert. This time the jury returned a verdict for Hillmann on the IWCA retaliatory-discharge claim and awarded $2 million in damages. Chief Judge Castillo submitted the ADA claim to the jury for an advisory verdict; the jury found for the City on this claim.

Posttrial proceedings followed. The City moved for judgment as a matter of law or a new trial on the IWCA retaliatory-discharge claim. On the ADA claim, the City urged the court to accept the jury's advisory verdict and enter findings and conclusions rejecting Hillmann's claim. Hillmann moved for judgment in his favor on both claims.

Chief Judge Castillo split the difference. He denied the City's motion for judgment as a matter of law on the IWCA claim. He did, however, reduce the damages award to $1.6 million. On the ADA claim, the judge accepted the jury's advisory no-liability verdict and entered detailed findings and conclusions of his own. He denied Hillmann's motion for judgment on the ADA claim.

The resulting judgment left something for both sides to appeal. And they did, raising multiple claims of error.

## II. Analysis

### A. IWCA Retaliatory-Discharge Claim

The City's opening salvo is a challenge to Chief Judge Castillo's decision to order a new trial. The district court has the discretion to "grant a new trial on all or some of the issues—and to any party," FED. R. CIV. P. 59(a), and a new trial should be granted if a prejudicial error occurred, *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 480 (7th Cir. 2000). We usually review an order granting a new trial for abuse of discretion, but normally the same judge presides at trial and also decides the posttrial motion. *McClain v. Owens–Corning Fiberglas Corp.*, 139 F.3d 1124, 1126 (7th Cir. 1998). Here, Chief Judge Castillo ordered a new trial after the original trial judge died. His ruling, moreover, was based on a legal determination concerning the Fifth Amendment privilege. In these circumstances de novo review applies. *See Bankcard Am.*, 203 F.3d at 481.

Chief Judge Castillo concluded that a new trial was warranted because Judge Hibbler should not have wholly excused Sullivan and Drumgould from testifying based on blanket assertions of their Fifth Amendment privilege

against self-incrimination. That ruling correctly understands how the privilege works in this situation; in a civil case, the jury is permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse inference from it. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify … ."); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, No. 15-2526, 2016 WL 4097439, at *14 (Aug. 2, 2016) ("The Fifth Amendment allows adverse inference instructions against parties in civil actions."); *Evans v. City of Chicago*, 513 F.3d 735, 745 (7th Cir. 2008); *Harris v. City of Chicago*, 266 F.3d 750, 755 (7th Cir. 2001); *United States v. Awerkamp*, 497 F.2d 832, 836 (7th Cir. 1974).

The City suggests that the error was harmless and therefore not a good reason to order a new trial. As a remedy, the City asks us to reinstate the verdict of the first jury, which found in the City's favor on the IWCA retaliatory-discharge claim. We don't need to decide whether the chief judge correctly construed this legal error as serious enough to justify a new trial. The undisputed evidence shows that this claim should not have gone to a jury at all.

A claim for retaliatory-discharge is not authorized by the IWCA itself. Rather, "[t]he Illinois Supreme Court has recognized a common-law cause of action for retaliatory discharge where an employee is terminated because of his actual or anticipated exercise of workers' compensation rights." *Beatty v. Olin Corp.*, 693 F.3d 750, 753 (7th Cir. 2012). The cause of action is "a 'narrow' and 'limited' exception to the at-will employment doctrine," and the state high court

has been "disinclined to expand" it. *Id*. (quoting *Zimmerman v. Buchheit of Spart, Inc.*, 645 N.E.2d 877, 881 (Ill. 1994)).

To prevail on his claim that he was fired in retaliation for exercising his rights under the IWCA, Hillmann had to prove three elements: (1) he was employed by the City at the time of his injury; (2) he exercised a right granted by the IWCA; and (3) his discharge was causally related to the exercise of his rights under the IWCA. *Grabs v. Safeway, Inc.*, 917 N.E.2d 122, 126 (Ill. App. Ct. 2009). Hillmann's case, like many others, turns on the element of causation. The ultimate question in the causation inquiry "is the employer's motive in discharging the employee." *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998). It's not enough for the plaintiff to establish that his workplace injury and initiation of a workers' compensation claim set in motion a chain of events that ended in his discharge. *Phillips v. Cont'l Tire The Americas, LLC*, 743 F.3d 475, 478 (7th Cir. 2014); *Casanova v. Am. Airlines, Inc.*, 616 F.3d 695, 698 (7th Cir. 2010). That is, but-for causation is necessary but not sufficient to prove the causation element of a retaliatory-discharge claim. *Phillips*, 743 F.3d at 478; *Casanova*, 616 F.3d at 697.

Accordingly, under Illinois law a claim for retaliatory discharge requires—at a minimum—that the relevant decision-maker knew that the employee intended to file or had filed a workers' compensation claim. *Beatty*, 693 F.3d at 753; *Hunt v. Davita, Inc.*, 680 F.3d 775, 779 (7th Cir. 2012); *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 769 n.7 (7th Cir. 1994) ("Evidence that those responsible for an employee's termination knew he intended to file, or, as in this case, had filed, a workers' compensation claim is essential to a retaliatory

discharge action under Illinois law." (citing *Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. Ct. 1990))).

In Hillmann's case the relevant decision-maker was Sanchez, who as Commissioner of Streets and Sanitation made the final decision about which positions within his department would be eliminated in the RIF. No evidence suggests that Sanchez knew that Hillmann had filed a workers' compensation claim. Hillmann hammers away on the evidence that Murphy and Hennessey were aware of his injury and gave him less prestigious and more physically rigorous assignments that seemed designed to aggravate his injury rather than to accommodate it. But they were not the RIF decision-makers. Illinois courts haven't recognized a cat's paw theory of liability in this context,[1] and that theory is hard to reconcile with the cases holding that the causation element requires evidence that the relevant decision-maker knew about the plaintiff's workers' compensation claim. In any event, Hillmann hasn't litigated his case on a cat's paw theory, so we have no reason to consider the question here.

Because Commissioner Sanchez made the final decision to include the timekeeper positions in the RIF and no evidence suggests that he knew about Hillmann's workers' compensation claim, the IWCA retaliatory-discharge claim fails as a matter of law. It should not have been submitted to one jury, let alone two. This conclusion makes it unnecessary for us to consider the City's more limited argument for a new trial on the issue of damages.

---

[1] One recent opinion of the Illinois Appellate Court considered the cat's paw theory of liability but concluded that the facts did not support it. *See Cippola v. Village of Oak Lawn*, 26 N.E.3d 432, 444 (Ill. App. Ct. 2015).

**B. The ADA Claim**

Hillmann's cross-appeal seeks review of the judge's decision rejecting his ADA claim. We will not disturb findings of fact made after a bench trial unless they're clearly erroneous. FED. R. CIV. P. 52(a). Conclusions of law are reviewed de novo. *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004).

Hillmann alleged that he was denied merit-pay increases and targeted for inclusion in the RIF because he requested an ADA accommodation when his workplace injury worsened in the summer of 2000. Here again, the sticking point is causation. To prevail on this claim, Hillmann had to prove that his request for an accommodation was the but-for cause of the merit-pay denials and his inclusion in the RIF. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). "[T]he ADA renders employers liable for employment decisions made 'because of' a person's disability, … [which] require[s] a showing of but-for causation." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). Put differently, Hillmann needed to prove that the City would not have taken these adverse employment actions "but for his actual or perceived disability; proof of mixed motives will not suffice." *Id.*

Chief Judge Castillo accepted the jury's advisory verdict on this claim but also entered detailed findings and conclusions to support his decision. He first found that Hillmann's request for an accommodation did not cause the July 1, 2000 merit-pay denial because Hillmann waited until August 8 to notify Vittori—his supervisor from May to August 16—that he could not perform the extra duties Vittori had assigned. The subsequent merit-pay denials, the judge found, resulted either from the City's confusing practice of "detailing"

employees to other departments or Hillmann's excessive tardiness and absenteeism. Finally, the judge found that there was "no nexus" between Hillmann's request for an accommodation and the inclusion of his timekeeper's position in the RIF.

These findings are well supported by the record. The judge noted that Hillmann produced no evidence from which to infer that any of the merit-pay denials were retaliatory or that the City's reasons for including his position in the RIF were pretextual. The RIF was necessitated by a budget shortfall and entailed 300–400 jobs. Hillmann was not singled out; *all* timekeeping positions in the Bureau of Electricity were included on the RIF list. The evidence established that no one was performing these functions anyway, and the implementation of the Kronos computerized payroll system made these positions obsolete. The judge's decision easily survives clear-error review.

To sum up, Hillmann lacked evidence to prove the element of causation on *either* claim, so the City was entitled to judgment as a matter of law on both. Accordingly, we REVERSE in part and REMAND with instructions to enter judgment for the City on the IWCA retaliatory-discharge claim. In all other respects, the judgment is AFFIRMED.