**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 2, 2020[*]
Decided April 8, 2020

**Before**

DIANE P. WOOD, *Chief Judge*

JOEL M. FLAUM, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 19-1736

| | |
|---|---|
| NATHANIEL JACKSON, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Central District of Illinois. |
| | |
| *v.* | No. 12-cv-1084 |
| | |
| ALTON ANGUS, et al., | Michael M. Mihm, |
| *Defendants-Appellees*. | *Judge*. |

**O R D E R**

This is the second time that Nathaniel Jackson's lawsuit—his third against staff at Pontiac and Dixon Correctional Facilities—comes to us on appeal. Jackson maintains that prison staff violated his constitutional rights when they transferred him twice to Dixon Special Treatment Center for mental-health treatment against his will. See 42 U.S.C. § 1983. In a prior decision, we vacated the entry of summary judgment on

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

claim-preclusion grounds and remanded the case for further proceedings on Jackson's claims (1) that certain mental-health officials at Pontiac and Dixon violated his due process rights during the transfers and (2) that, during the second transfer, Pontiac's tactical team used excessive force when extracting him from his cell. See *Jackson v. Angus*, 686 F. App'x 367 (7th Cir. 2017). On remand, the district court entered summary judgment for the remaining defendants. Jackson appeals, and we affirm.

During Jackson's incarceration from 2002 to 2016, various mental health professionals diagnosed him with serious mental illnesses (including schizophrenia and psychotic disorder), and he was transferred between different prisons several times—sometimes at his request and other times involuntarily. This suit concerns his last two transfers (in March 2011 and July 2012), over his objections, from Pontiac to Dixon Special Treatment Center (STC)—a unit specializing in mental-health care. See ILL. ADMIN. CODE 415.20(k).

In late 2010, Jackson was placed in segregation at Pontiac with a psychiatric referral for paranoid behavior. Soon after, Dr. Alton Angus, a psychologist, attempted to evaluate his mental-health status and needs. But Jackson refused to discuss his mental-health history, accused Dr. Angus of harassing him, and threatened the psychologist with a lawsuit. Dr. Angus conferred with other mental-health staff about where to house Jackson after his release from segregation and determined that he needed a mental-health placement.

A few days later, Dr. José Mathews, a Pontiac staff psychiatrist, recommended Jackson's transfer to Dixon STC. After reviewing Jackson's medical records and interviewing him in his cell (Jackson refused to come out), Dr. Mathews diagnosed paranoid schizophrenia, paranoid personality disorder, and possible delusional disorder. Jackson was not a danger to anyone, Dr. Mathews concluded, but he would struggle to adjust to general population because of his paranoid behavior. If Jackson did not consent to the transfer, Dr. Mathews asked the Placement Review Board to consider sending him to Dixon STC against his will.

Dr. Angus then delivered a written notice of the transfer to Jackson's cell and sought his consent. Jackson refused. Dr. Angus tried to read him the notice, which explained how he could request a hearing before the Board and present evidence to contest the transfer, but Jackson grew hostile and refused to accept a copy of the notice.

Jackson did not request a hearing and refused to participate when the Board met at the month's end to consider the transfer. The Board gave its approval and, in a

memorandum, informed Jackson that it based its decision on Dr. Mathews's recommendation and its own review of Jackson's psychiatric records. Jackson was told he could request a review of the decision at any time, and he was entitled to a hearing every six months.

Jackson was transferred from Pontiac to Dixon STC in March 2011, the first of the two transfers at issue in this appeal. Dr. Jamie Lynn Chess, a staff psychiatrist who conducted an initial mental-health screening, observed that Jackson was illogical, paranoid, agitated, and guarded, and she diagnosed potential paranoid schizophrenia. Over the next six months, Jackson refused to attend his scheduled mental-health appointments or speak with mental-health staff who visited his cell. In August, he was transferred out of Dixon STC and eventually returned to Pontiac, where he demanded to be taken off the psychiatric roll call. Based on his demands, mental-health staff stopped coming to his cell.

The following July, still at Pontiac, Jackson requested a mental-health evaluation. A psychiatrist came to his cell, but Jackson refused to speak with him, and the psychiatrist—after reviewing Jackson's records—recommended a second transfer to Dixon STC. Dr. Angus again visited Jackson in his cell to notify him of the proposed transfer, and again Jackson became hostile, refusing to sign or accept the notice. When the Board met a few days later and approved the transfer, Jackson refused to attend or participate. He received a memorandum of the decision a few days later.

The second transfer at issue occurred in late July, when several Pontiac tactical team officers came to Jackson's cell to transfer him. After ordering him three times to come out of his cell, they warned him that they would use pepper spray if he did not comply. When he still refused, they dispensed two short bursts of pepper spray into his cell. After the fourth order, he finally left his cell, and officers led him outside, where a nurse flushed his eyes. The officers then brought him back into the prison, where they changed him into a fresh jumpsuit, before taking him to Dixon STC. He remained at Dixon STC until Dr. Chess recommended that he be transferred out of the facility in February 2013.

Jackson brought this prisoner's rights action against employees from Dixon and Pontiac. He alleged, in relevant part, that mental-health staff violated his due-process rights during the two transfers to Dixon STC, and that members of Pontiac's tactical team used excessive force when they extracted him from his cell during the second transfer. The district court determined that the suit was barred by two prior lawsuits that Jackson had filed in state court. On appeal, however, we vacated the judgment with

regard to certain members of the mental-health staff at both prisons as well as Pontiac's tactical team because the suits did not cover the same claims and defendants. See *Jackson*, 686 F. App'x at 372.

On remand, the remaining defendants moved for summary judgment, and Jackson requested counsel. The district court briefly recruited law students to represent him, but Jackson later told the court he did not want their representation. When the court gave him the choice of proceeding with the students or representing himself, he chose self-representation. He later requested counsel again, but the court denied his request on grounds that the case's subject matter was not complex, and there was no indication that he could not handle the case himself.

The court ultimately entered summary judgment for the defendants. Jackson's procedural due-process claims failed because, although he had a liberty interest in avoiding an involuntary transfer to a mental-health hospital, he had not identified any fact question regarding the procedural protections he was afforded: He received notice of the transfer, an opportunity for a hearing, and an opportunity to appeal the decision. Substantively, he had not come forward with any evidence showing that he was not mentally ill. Moreover, Jackson's excessive force claim failed because, although he asserted that he was viciously beaten and pepper sprayed by tactical team officers during the cell extraction, video evidence contradicted these claims and showed only a de minimis use of force. And no evidence supported Jackson's claims that the footage was tampered with.

On appeal, Jackson first challenges the district court's ruling on his due process claim, maintaining that the Board's decisions to transfer him were not supported with adequate findings or evidence. Relying on *Vitek v. Jones*, 445 U.S. 480, 493–96 (1980), in which the Supreme Court held that a prisoner's involuntary transfer to a mental hospital implicated a liberty interest protected by due process, he insists that the Board's transfer decisions had to contain findings that he suffered from a grave mental illness and be supported by evidence such as behavioral incidents or descriptions of his symptoms. Jackson reads *Vitek* together with Section 415.70 of the Illinois Administrative Code, which governs involuntary psychiatric medication of prisoners, to mean that the Board needed to find that he was "gravely disabled."

Jackson misapprehends *Vitek* as establishing an evidentiary threshold for an involuntary transfer. *Vitek* held only that prisoners are entitled to notice and a hearing before being subjected to the stigmatizing effect of a transfer to a mental hospital together with mandatory behavior-modification treatment. *Id.* at 495–96. And Section

415.70's requirement of a "grave disability" finding is triggered only when prison staff medicate a prisoner involuntarily. Jackson presented no evidence that Dixon STC was a mental hospital that subjected him to mandatory programming or that he was involuntarily medicated there. To the contrary, he admitted that the only difference between general population and Dixon STC was that he had scheduled mental-health appointments, which he could refuse to attend.

Under the Illinois Administrative Code, prison staff provided Jackson with all the process he was due. See *Vitek,* 445 U.S. at 488. Before any transfer can take place to a unit like Dixon STC that specializes in mental-health care, the code requires only a certified recommendation by a staff psychiatrist. See ILL. ADMIN. CODE 503.150; 415.20. Inmates who do not voluntarily consent to such a transfer must receive written notice of their right to challenge the transfer recommendation at a hearing before the Board. *Id.* Here, Jackson received written notice of both proposed transfers and, when he withheld consent, Dr. Angus attempted to explain to him how to challenge the recommendations at a hearing. Moreover, the Board provided Jackson with written decisions explaining that it had approved the transfers based on the staff recommendations and its own review of his psychiatric records. And though Jackson asserts that the psychiatric reports reviewed by the Board were false, he did not take the opportunity to challenge them before the Board, and he has not offered any evidence supporting his assertions.

We turn next to Jackson's excessive force claims against the members of Pontiac's tactical team. Jackson argues that the district court improperly concluded that video footage of the cell extraction in July 2012 showed only a de minimis use of force. In affidavits, he insists that the correctional officers beat him, used pepper spray without justification, twisted his wrists, and pressed him against the wall to provoke him when they restrained him.

We agree with the district court that Jackson's assertions do not create a factual dispute because they are clearly contradicted by video evidence. See *Scott v. Harris,* 550 U.S. 372, 379–81 (2007). Correctional officers violate the Eighth Amendment when they use force "maliciously and sadistically for the very purpose of causing harm," but not when they apply it in good faith to maintain or restore discipline. See *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). Here, video footage shows that tactical team officers used two short bursts of pepper spray on Jackson only after he disobeyed three direct orders to come out of his cell for the transfer. See *Rice ex rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 668 (7th Cir. 2012) (use of pepper spray justified when inmate refused to comply with order to step

out of cell). After he left his cell, they led him outside so that a nurse could flush his eyes before changing him into a new jumpsuit to mitigate the effects of the pepper spray. Though they kept him restrained, the video shows only incidental bumping, which the district court properly concluded did not constitute excessive force. See *Fillmore v. Page,* 358 F.3d 496, 504–05 (7th Cir. 2004) (inmate's discomfort and sore wrists from restraint during transfer were not actionable). To the extent that Jackson continues to insist that the video footage is doctored or incomplete, he submitted no evidence to support these assertions.

Finally, Jackson argues that the district court erred when it refused his request to recruit new counsel after he grew dissatisfied with the law students' representation. He maintains that he did not have the resources to gather evidence on his own and that he could not be expected to competently litigate his case while the defendants were accusing him of being mentally ill. But the court properly considered both the complexity of the case and Jackson's ability to litigate it himself each time he requested counsel. See *Pruitt v. Mote*, 503 F.3d 647, 654–55 (7th Cir. 2007) (en banc). Based on Jackson's ability to litigate multiple cases on his own for several years and our own review of the evidence he submitted in support of his claims, we cannot conclude that the district court abused its discretion in deciding not to recruit a second lawyer for him. *Id.* at 658–69.

AFFIRMED