In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1219

FABIAN SANTIAGO,

*Plaintiff-Appellant,*

*v.*

JONATHAN R. WALLS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:02-cv-00784-JPG—**J. Phil Gilbert**, *Judge*.

ARGUED MAY 29, 2009—DECIDED MARCH 29, 2010

Before RIPPLE, ROVNER and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Fabian Santiago was a prisoner at the Menard Correctional Center in Illinois ("Menard"), where he was assaulted on several occasions. He filed this pro se action under 42 U.S.C. § 1983 against certain officers and employees of the Illinois Department of Corrections ("IDOC"), alleging that they had violated his constitutional rights by failing to protect him from other inmates, failing to provide him with medical care

and retaliating against him for speaking out against the IDOC. The court dismissed three of the seven claims that Mr. Santiago brought for failure to state a claim. During discovery, Mr. Santiago repeatedly requested that the court recruit counsel, pursuant to 28 U.S.C. § 1915(e)(1).[1] However, the court declined to do so until three months before trial, which was more than twenty months after discovery had closed. After a two-day trial, a jury found in favor of the defendants, and Mr. Santiago brought this appeal. Because we believe that the district court erred in dismissing Count Four of Mr. Santiago's complaint and abused its discretion by not recruiting counsel for Mr. Santiago during discovery, we affirm in part and reverse in part the judgment of the district court and remand this case for further proceedings.

---

[1] Because there is no constitutional or statutory right to counsel in civil litigation of this sort, federal courts do not have the authority to appoint coercively a member of the bar to represent a litigant. However, because such representation is a professional obligation of members of the bar, courts regularly are able to find attorneys willing to take on this task in the highest traditions of their profession. Therefore, these requests are, as a practical matter, appointments and are often referred to as such. *See Pruitt v. Mote*, 503 F.3d 647, 653-54 (7th Cir. 2007) (en banc), *see also Tucker v. Randall*, 948 F.2d 388, 391 n.3 (7th Cir. 1991) ("We use the term 'appoint' only as a shorthand for this recruitment process.").

# I

## BACKGROUND

### A. Incidents at the Menard Correctional Center

### 1. The fight with Harris

On April 17, 2001, while Mr. Santiago was a prisoner at Menard,[2] he fought with his cellmate, Haynes.[3] Another inmate, Isaac Harris, witnessed the altercation; during the fight he yelled for Mr. Santiago "not to trip" because Harris had him. R.1 (5/21/2002 Grievance Report). Mr. Santiago interpreted this verbal intervention as a threat of retaliation. Correctional Officer ("C.O.") Gary Rednour and C.O. Butler witnessed this exchange but did not report the threat to the prison authorities. Although Mr. Santiago filed a grievance regarding the alleged threat by Harris, he claims that he was unable to list Harris as an enemy[4] because he knew Harris only by a nickname, "Ice."

In a prison disciplinary proceeding concerning Mr. Santiago's fight with Haynes, Mr. Santiago was found guilty of fighting and was placed in segregation for six

---

[2] Mr. Santiago was later transferred to the Pontiac Correctional Center in 2003.

[3] The record does not disclose the first names of several parties and witnesses involved in this case.

[4] The "enemy list" is a list maintained by Menard for its prisoners. Each prisoner lists individuals with whom he should not be placed in a cell because of safety concerns. *See* R.1 (4/23/2001 Final Summary Report).

months. The grievance officer's report noted that, in the future, Mr. Santiago should report any enemies to his counselor so that such individuals would not be placed in his cell.

### 2. The Harris assault

On May 15, 2002, Warden Jonathan Walls and Captain Ramage assigned Mr. Santiago to Harris's cell. Later that day, while Mr. Santiago was eating lunch in the cafeteria, Harris attacked him. Mr. Santiago alleges that, during the ensuing fight, Sergeant Suemnicht was standing approximately fifteen feet away but did not intervene until Mr. Santiago got up, turned around and attempted to hit Harris. At that time, Sergeant Suemnicht sprayed Mr. Santiago and Harris with pepper spray. C.O. John Doe 1[5] then tackled Mr. Santiago to the ground, causing him "extreme pain." R.28 at 5. The complaint further alleges that, while escorting Mr. Santiago to the infirmary, C.O. John Doe 1, "brutally yank[ed] and rip[ped]" backwards Mr. Santiago's handcuffs, giving him abrasions and causing him further pain. *Id.* Mr. Santiago further alleges that he was treated in this manner by the officers even though he offered no resistance.

---

[5] The officers involved in this incident were listed in the original complaint as officers John Doe 1 and John Doe 2. After the parties determined that John Doe 1 was Sergeant Suemnicht, the remaining unnamed officer subsequently was referred to as "John Doe 1."

According to Mr. Santiago's complaint, when he reached the infirmary, Dr. John Doe refused to treat him. Dr. John Doe instead told C.O. Keys to move Mr. Santiago to a segregation unit. C.O. Keys first placed Mr. Santiago in a holding cell within view of a surveillance camera and then later moved him to segregation. Mr. Santiago states that he suffered from migraine headaches and facial pain and that he had trouble eating.

### 3. The Castro assault

Not long after the Harris assault, Mr. Santiago was moved into a cell with Castro, who, Mr. Santiago alleges, had a history of assaulting his cellmates. Mr. Santiago filed an emergency grievance with Warden Walls, requesting that his cellmate be placed on his enemy list and seeking relocation to avoid a physical confrontation.[6] The request specifically informed the warden that Mr. Santiago believed there was a conscious practice on the part of the prison guards to place him with inmates with whom he was bound to have a confrontation that would result in his being sent to segregation. Warden Walls took no action.[7] Four days later, Mr. Santiago was assaulted severely by Castro and sustained cuts, swelling and bruises to his face—"the walls, floor and bed full of

---

[6] The parties agree that the grievance did not contain Castro's name.

[7] At oral argument, the defendants stated that Warden Walls's office rejected the emergency grievance in writing.

my blood." R.1 at 5. Mr. Santiago alleges that, after he was assaulted, C.O. Jines, C.O. Cox and others refused to provide him with medical treatment. He further alleges that the guards placed him in another cell with a prisoner who had assaulted a guard. The complaint also alleges that prison guards attempted to place him in a yard with Harris in order to expose him to further attack.

## B. Litigation in the District Court

### 1. Discovery

In July 2003, Mr. Santiago filed this pro se section 1983 action in the Southern District of Illinois against the defendants. The district court divided the amended complaint into seven counts: Count One against Warden Walls, C.O. Ramage and C.O. Keys for failing to protect Mr. Santiago from the Harris assault; Count Two against Sergeant Suemnicht and C.O. John Doe 1 for using excessive force following the Harris assault; Count Three against C.O. Keys for using excessive force against Mr. Santiago and against Dr. John Doe for failing to provide medical care following the Harris assault; Count Four against Warden Walls for failing to protect Mr. Santiago from Castro; Count Five against Warden Walls for failing to protect Mr. Santiago by moving him into the same cell block as Harris after Mr. Santiago was released from segregation; Count Six against C.O. Jines and C.O. Cox for failing to provide Mr. Santiago with medical treatment following the Castro assault; and Count Seven against Warden Walls and C.O. Keys for

retaliating against Mr. Santiago for speaking out against IDOC employees. R.1; R.28.

During the course of litigation, the court dismissed Counts One, Two and Four without prejudice for failing to state a claim upon which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6). The court also dismissed Captain Ramage, Sergeant Suemnicht, C.O. Rednour and C.O. Butler from the case because they were not named as defendants in the surviving claims.

In 2004 and 2005, Mr. Santiago filed motions in an attempt to conduct discovery. On August 9, 2004, he sought to compel the defendants to disclose discovery materials. Mr. Santiago observed that Warden Walls's and C.O. Keys's response contained little of the material that he requested more than four months prior. They claimed that the identities of the witnesses to the Harris and Castro assaults were "not relevant" to the case, and they instructed Mr. Santiago to obtain the information that he needed through the IDOC. R.85, Ex. A at 2. Mr. Santiago had maintained that communication with IDOC would not be useful without first learning the identities of the witnesses, and he noted that IDOC would only allow inmates to communicate with relatives. On August 20, the district court concluded that Mr. Santiago's motion was premature because he had not made a good-faith effort to resolve his dispute after receiving objections and a response to his discovery request. Mr. Santiago unsuccessfully filed an objection to the ruling.

On October 28, Mr. Santiago filed a "motion requesting to depose all defendants, witnesses." R.100. His motion

was denied on the basis that he did not need leave to depose the defendants. Mr. Santiago filed a motion for sanctions on February 23, 2005, which he later supplemented, stating that the defendants had failed to comply with his discovery requests. On May 23, the district court denied his motion for sanctions, finding that Mr. Santiago had not made a good-faith effort to resolve the dispute because he had failed to confer with the defendants regarding their objections and responses to his discovery requests.

At the close of discovery, Mr. Santiago had not succeeded in identifying C.O. John Doe 1, Dr. John Doe or any witnesses to the Harris and Castro assaults. He had not taken any depositions or served any interrogatories. Mr. Santiago was also unable to obtain any of the prison surveillance videos.

## 2. Recruitment of counsel

Before and during discovery, Mr. Santiago filed several motions seeking the recruitment of counsel.

On August 28, 2003, the court denied Mr. Santiago's first such motion:

> Plaintiff has not demonstrated that he has made reasonable attempts to retain counsel and has not shown that he was effectively precluded from making a diligent effort in this regard. However, the facts and issues in this case are not complex and it appears at this time that plaintiff is able to determine the facts and present his case without

assistance from counsel. Finally, plaintiff's likelihood of success on the merits is, at this point, questionable.

R.15 at 2 (footnote omitted).

In February 2004, Mr. Santiago filed a second motion seeking the recruitment of counsel. *See* R.28. He maintained that he needed assistance obtaining and reviewing evidence including reports, grievances, medical documents and camera footage. Mr. Santiago also stated that he needed assistance contacting and interviewing several witnesses.

In April, Mr. Santiago filed a third motion for the recruitment of counsel, which restated his previous assertions. On May 7, the court denied that motion because Mr. Santiago had not made "any attempt to obtain representation on a contingency fee or pro bono basis," nor had he shown that he was unable to make such an effort. R.53.

On May 17, 2004, Mr. Santiago filed a fourth request for the recruitment of counsel, in which he reiterated his earlier statements regarding his problems conducting discovery, noted that he needed help locating and deposing witnesses and argued that the prison restricted his ability to keep legal documents in his cell. He attached six letters from various law firms and organizations declining to represent him. The court nevertheless denied this motion, finding that Mr. Santiago was competent to represent himself through the pretrial stage because he could read and write, understand the nature of his claims and comprehend and follow rules of procedure.

The court further noted that Mr. Santiago's claims were not complex, and that he had access to tools that would help him determine which laws and rules governed his case, gather and exchange information, and communicate with the court and with the defendants' counsel. R.72 at 2. However, it observed that Mr. Santiago's skills might not be adequate for him to represent himself at trial. Consequently, the court dismissed Mr. Santiago's motion without prejudice with regard to the recruitment of counsel for trial. *Id.*

On September 29, 2006—twenty months after the close of discovery—the court reconsidered its previous ruling sua sponte and granted Mr. Santiago's motion for the recruitment of counsel. The order stated explicitly that the appointment was "only for the purposes of trial." R.173. Mr. Santiago's attorney made his first appearance on December 5, 2006, less than two months before the start of trial.

### 3. Trial

Mr. Santiago's two-day trial began on January 29, 2007. Mr. Santiago's only witnesses were himself and Harris. At the close of his case, several of the defendants moved for judgment as a matter of law. The court reserved the matter. After trial, the defendants renewed their motion; the court granted the motion with regard to Warden Walls on Count Five and C.O. Keys on Count Seven. On January 30, the jury returned a verdict for the remaining defendants on all counts.

## II

## DISCUSSION

### A.

Mr. Santiago asks that we review the district court's decision to dismiss three of the counts in his complaint at the initial screening phase. *See* 28 U.S.C. § 1915A. We review such dismissals de novo, *Westefer v. Snyder*, 422 F.3d 570, 574 (7th Cir. 2005), and apply the same standard used for evaluating dismissals under Rule 12(b)(6), "taking all well-pleaded allegations of the complaint as true and viewing them in the light most favorable to the plaintiff," *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000).

### 1. Count One

Mr. Santiago submits that the district court erred in concluding that amended Count One failed to state a claim against C.O. Rednour and C.O. Butler for failure to protect Mr. Santiago in connection with the Harris assault. Mr. Santiago observes that, in order to state a section 1983 claim against prison officials for failure to protect, he must establish: (1) that he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) that the defendants acted with "deliberate indifference" to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Mr. Santiago contends that Harris's threat constituted a substantial risk of harm. *See Weiss v. Cooley*, 230 F.3d

1027, 1030, 1032 (7th Cir. 2000) (noting that a prisoner faced an objective risk of serious injury because of inmate threats and attacks). He maintains that C.O. Rednour and C.O. Butler knew of this threat and disregarded it, thereby acting with deliberate indifference to his health and safety. Mr. Santiago claims that the two officers refused to report Harris's threats against him, which would have allowed Harris to be placed on his enemy list.

The defendants maintain that, given the vagueness of Harris's threat, C.O. Rednour and C.O. Butler were properly dismissed from the lawsuit because they did not show deliberate indifference to Mr. Santiago's safety.[8] In their view, once Mr. Santiago was disciplined and moved into segregation, the possibility of an attack by Harris was remote. They also claim that Mr. Santiago could have put Harris on his enemy list without their assistance because identifying Harris by his nickname was sufficient to get Harris on Mr. Santiago's enemy list. They further note that they had no way of knowing that Mr. Santiago would later be transferred to the same cell as Harris.

We have held that failure to provide protection constitutes an Eighth Amendment violation only if deliberate

---

[8] The Illinois Attorney General represents Warden Walls, C.O. Keys, C.O. Jines and C.O. Cox. Although the Illinois Attorney General does not have an attorney-client relationship with the remaining defendants, she has structured her argument on behalf of all of the defendants.

indifference by prison officials to a prisoner's welfare "effectively condones the attack by allowing it to happen." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (citation and quotation marks omitted). To sustain his Eighth Amendment claim on Count One, Mr. Santiago had to allege facts sufficient to show "that the defendants had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Id.* (citation and quotation marks omitted).

We do not believe that Mr. Santiago has made such an allegation. Specifically, he has failed to allege that C.O. Rednour and C.O. Butler had any knowledge of the impending harm. Notably, the allegations of the complaint make clear that C.O. Rednour filed a report regarding the fight between Mr. Santiago and Haynes and that Mr. Santiago consequently was found guilty and moved into solitary confinement for six months. This move to solitary confinement protected Mr. Santiago from impending harm. Indeed, Harris did not assault Mr. Santiago until more than a year after he had made the threat. Consequently, we must conclude that the district court correctly dismissed Count One.

### 2. Count Two

Count Two focuses on Harris's assault. Mr. Santiago contends that he has stated a claim against Sergeant Suemnicht and C.O. John Doe 1 for excessive force because their actions constituted the wanton and unjustified

infliction of unnecessary pain against a submissive inmate and because such action constitutes the use of malicious force, as opposed to a good-faith effort to maintain or restore discipline. *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992). He maintains that the fact that force was used in the context of an inmate altercation does not defeat his claim because he "offer[ed] no resistance to [the] staff during inmate Harris['s] assault." R.28 at 5.

The defendants submit that the district court properly dismissed Count Two. They observe that Mr. Santiago admitted in his grievance report that Sergeant Suemnicht did not use mace until Mr. Santiago hit Harris. *See* R.1 (5/21/2002 Grievance Report). They contend that their reaction to the fight was not excessive force under *Hudson*, 503 U.S. at 7.

In *Hudson*, the Supreme Court held that, when prison officials are accused of using excessive force, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. To determine whether force was applied in good faith, we consider several factors, "including the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). We have noted, in the context of surviving summary judgment, that "the prisoner must have evidence that 'will support a reliable inference of wantonness in the infliction

of pain.'" *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

The allegations in Mr. Santiago's complaint will not support an inference of excessive force on the part of Sergeant Suemnicht and C.O. John Doe 1. Mr. Santiago's grievance report establishes that both he and Harris were fighting and therefore supports the defendants' position that there was a need for the officers to use force. We have held that the use of mace is appropriate "when reasonably necessary . . . to subdue recalcitrant prisoners." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (citations and quotation marks omitted) (alteration in original). Given the threat to the safety of the officers and the threat to the maintenance of good order and discipline in the institution, the use of mace and handcuffs cannot be characterized as deliberate indifference. The complaint does not allege adequately that Sergeant Suemnicht and C.O. John Doe 1 acted "maliciously and sadistically for the very purpose of causing harm." *Farmer*, 511 U.S. at 835 (citation and quotation marks omitted). The district court therefore correctly dismissed this count of the complaint.

### 3.  Count Four

Count Four alleged that Warden Walls had failed to protect Mr. Santiago from the Castro assault.

The Eighth Amendment's prohibition against cruel and unusual punishment requires that prison officials "take reasonable measures to guarantee the safety of the in-

mates." *Farmer*, 511 U.S. at 832 (citation and quotation marks omitted). Therefore, those charged with the high responsibility of running prisons are required, as a matter of constitutionally imposed duty, to "protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (citation and quotation marks omitted). Mr. Santiago submits that Castro had a history of assaulting cellmates prior to Mr. Santiago's being housed with Castro and later caused Mr. Santiago serious injury. *See Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (noting that to satisfy the objective prong of a failure to protect claim, "a plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur"). He also alleges that staff deliberately housed him with Castro in order to provoke a confrontation. Indeed, he maintains that this housing decision was part of a pattern of the guards housing him with inmates who would cause such a confrontation and that his grievance to the warden expressly put the warden on notice of that practice.

Mr. Santiago submits that Warden Walls knew or should have known that Castro had a history of assaulting his cellmates and that Warden Walls disregarded that risk. *See id.* at 914 (holding that plaintiff's allegation about what prison officials knew about a dangerous prisoner is sufficient to survive dismissal under Rule 12(b)(6)). He notes that, four days prior to his assault, he had filed an emergency grievance with Warden Walls, requesting that Castro be placed on his enemy list and that a "cell change be conducted to

prevent a physical confrontation." R.28 at 5-6. Mr. Santiago contends that Warden Walls disregarded the risk that Castro posed by failing to grant Mr. Santiago an immediate cell change.

The Warden submits that Mr. Santiago did not allege that Warden Walls actually knew of Castro's violent history at the time that he was attacked. He claims that the complaint only alleges that he had a duty to investigate Castro following receipt of the grievance. He also notes that Mr. Santiago did not request that he conduct an investigation. The Warden states that the grievance did not identify Castro by name and did not suggest that Mr. Santiago had any specific information indicating that he posed a threat. The Warden observes that his designees signed the grievance follow-up. He further observes that there is no respondeat superior liability under section 1983.

This claim should not have been dismissed. To state a claim for failure to protect, Mr. Santiago needed to allege that (1) he was incarcerated under conditions posing a substantial risk of serious harm and (2) that Warden Walls acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834. Mr. Santiago met the first requirement because he alleged that he was being housed with inmates who, because of their behavior history, posed a significant risk of confrontation and violence. He also alleged that his present placement was part of a practice of housing him in explosive situations that would result in his continued placement in segregation. *See Brown*, 398 F.3d at 910. With regard to the

second requirement, Mr. Santiago alleged that he sub-
mitted a grievance to Warden Walls's office, asking that the
inmate with whom he was being housed be placed on
his enemy list and that he be given a cell change. The
grievance claimed that the prison officials were
following a practice of placing him in cells with inmates
with whom there was bound to be a confrontation. He
further alleged that the Warden "knew or should have
known" that Castro was dangerous. We think that this
allegation is sufficient, at the pleading stage, to state a
claim that Warden Walls actually knew or consciously
turned a blind eye toward an obvious risk. Mr. Santiago
cannot know for certain what Warden Walls knew
without discovery. Consequently, the district court
should not have dismissed this count of the complaint.

The dissent suggests two infirmities with Mr. Santiago's
pro se complaint. First, it would require a much greater
level of specificity in both the complaint and in the ap-
pended grievance form. With respect to the grievance,
neither this court nor any other American court has
imposed the requirements of fact or code pleading on
such a document. The purpose of a grievance is, quite
simply, to advise prison management of a situation that
could harm the good order and discipline of the institu-
tion so that remedial steps can be taken by the officer
who is responsible for such remedies. Here, the warden
was informed that personnel under his command were
undermining the good order and discipline of the institu-
tion by placing Mr. Santiago in situations where violence
was inevitable. Although the dissent apparently takes
the contrary view, we believe that any warden worth his

or her salt would consider such an allegation sufficient to commence an aggressive investigation. Most wardens would not fail to meet their responsibilities simply because the complaining prisoner, while alleging retaliation, failed to name names. The maintaining of prison discipline does not depend on prisoners naming names. To the extent that the dissent is asserting that the complaint itself lacked sufficient specificity, it is asking for a return to the days before the Supreme Court eliminated that impermissible gloss on the Federal Rules in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). It is clear that this complaint conforms to the standards set out by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009). *See generally Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam).

The dissent's second reason for justifying the dismissal of the complaint is not based on any legal principle but on the assumption that summary judgment should be granted because, at trial, Mr. Santiago admitted that he threw the first punch when the inevitable altercation with Castro occurred. This is an argument without legal substance. As the dissent suggests, it is possible for a litigant to induce his own defeat by asserting in an affidavit facts that *negate* his case. Here, however, Mr. Santiago did nothing of the sort. It is important to remember that his allegation in this case is an Eighth Amendment claim that the warden was deliberately indifferent by permitting his employees to create, and by continuing by his own inaction, a situation that inevitably would lead to confrontation and violence. Stated bluntly, Mr. Santiago

is alleging that he was set up. Identity of the first to throw a punch certainly does not negate the gravamen of Mr. Santiago's complaint that the warden was deliberately indifferent. It was the warden's job to ensure that *no* fight ever took place. According to the allegations of the complaint, his officers were provoking such an altercation, and he did nothing to stop it. That allegation is sufficient to survive dismissal.

**B.**

Mr. Santiago next challenges the district court's failure to recruit counsel during the discovery phase of this case. We review its decision under 28 U.S.C. § 1915(e)(1) for an abuse of discretion. *Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005). Our review is limited to the evidence available at the time that the motion was denied, that is, on July 8, 2004. *Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007) (en banc).

**1.**

Mr. Santiago submits that the court should have recruited counsel for him during discovery because his claims were complex. He observes that his claims involved First and Eighth Amendment issues, including multiple claims of deliberate indifference by prison staff. Mr. Santiago contends that his submissions to the court demonstrated that he was incapable of litigating these claims without assistance. He further maintains that he was unable to gather evidence or to take depositions

because he was no longer incarcerated at Menard, the prison where the assaults took place and where all of the defendants, witnesses and evidence were located.

Mr. Santiago also submits that there is a reasonable likelihood that assistance of counsel during discovery would have changed the outcome of this litigation. He observes that he was unable to learn the identity of Dr. John Doe, and that he could not obtain the prison camera footage. Mr. Santiago also points out that he was unable to identify prisoners who witnessed the Harris and Castro attacks and was, therefore, unable to call material witnesses at trial. Mr. Santiago maintains that an attorney would have helped him obtain this evidence. He further submits that his poor performance at trial demonstrates that he was prejudiced by not having counsel during discovery.

The defendants submit that the district court did not abuse its discretion when it denied Mr. Santiago counsel during discovery. They observe that Mr. Santiago filed numerous pleadings, motions and exhibits which establish that Mr. Santiago understood the nature of the dispute and was capable of litigating his case pro se. The defendants maintain that Mr. Santiago's claims are not factually complex and that he benefitted from special rules that govern pro se litigants prior to trial. They contend that Mr. Santiago's imprisonment at a facility other than Menard did not hinder his ability to conduct discovery. The defendants further claim that Mr. Santiago is foreclosed from arguing that he was prejudiced by the lack of access to counsel during dis-

covery because his recruited attorney neither made such an argument before the district court nor attempted to reopen discovery.

## 2.

The principles that govern our evaluation of the recruitment of counsel under section 1915(e)(1) are well-established.[9] In our en banc decision in *Pruitt*, 503 F.3d 647, we set forth succinctly the rules of law that must govern this issue. This case simply requires that we apply these principles to the rather unique factual circumstances before us in this case.

We begin by reiterating—and reaffirming—the basic principles set forth in *Pruitt*. There is no constitutional or statutory right to court-recruited counsel in federal civil litigation. Nevertheless, "an indigent civil litigant may ask the district court to request an attorney to represent him *pro bono publico*." *Id.* at 649. The recruitment of pro bono counsel "is not limited to the trial phase of the case" but, rather, may encompass discovery as well. *Id.* at 655. When the district court is confronted with a request for counsel under section 1915(e)(1), the district

---

[9] We must note, in fairness to our colleague in the district court, that the rulings under review in this case antedated our ruling in *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (en banc). The district court therefore did not have the benefit of our clarification of the principles governing the appointment of counsel in civil litigation—principles that we now simply apply to the unique circumstances of this particular case.

court must make the following inquiries: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Id.* at 654. If a court's denial of counsel "amounts to an abuse of its discretion, we will reverse only upon a showing of prejudice." *Id.* at 659.

The defendants concede that Mr. Santiago had made a reasonable attempt to obtain counsel prior to filing his final motion for the recruitment of counsel. *See* Appellees' Br. 29 n.3. Therefore, following the methodology outlined in *Pruitt*, we must next determine whether, in the particular circumstances of this case, the district court abused its discretion in determining that Mr. Santiago appeared competent, given the difficulty of his case, to litigate without the assistance of counsel. We assess, deferentially, the district court's determination by viewing the information available to the district court at the time that it made the decision. We must determine whether the factual and legal difficulty of this case so exceeded Mr. Santiago's abilities as a layperson as to make the denial of appointment of counsel an abuse of discretion. *See Pruitt*, 503 F.3d at 655. We must therefore examine both the difficulties posed by the particular case and the capabilities of the plaintiff to litigate such a case.

With respect to the difficulty of the case, we noted in *Pruitt* that cases involving complex medical evidence are typically more difficult for pro se defendants. On several occasions, we also have observed the difficulty

that prisoners face when litigating constitutional claims that involve the state of mind of the defendant. For instance, in *Merritt v. Faulkner*, 697 F.2d 761, 764 (7th Cir. 1983), we stated:

> Quite often the factual and legal issues in a civil case are more complex than in a criminal case. This often will be true in cases presenting constitutional questions. Indeed, surviving a critical motion to dismiss under Fed.R.Civ.P. 12(b)(6) may well depend upon the ability to perform legal research and present sophisticated legal arguments in such doctrinally complex areas as prisoner medical rights or free speech.

*Id.* (citations omitted). In that case, we recognized that the issue of whether the defendants acted with deliberate indifference to the plaintiff's injury was "too complex" for the defendant because the issue depended "upon the subtle appreciation of legal causation and of the duties imposed upon state prison officials" by the Eighth Amendment. *Id.* at 765. *Swofford v. Mandrell*, 969 F.2d 547 (7th Cir. 1992), is also illustrative. In *Swofford*, prison officials allegedly failed to come to the plaintiff's aid when he was beaten severely and sexually assaulted. In his complaint, the plaintiff alleged "abuse and failure of protection" under the Fourteenth Amendment. *Id.* at 548. We observed that the case was complex due to "the difficult and subtle question of the state of mind" of the defendants. *Id.* at 552. We further acknowledged that the plaintiff was unable "to investigate crucial facts" and that the outcome of the case would turn on witness credibility.

*Id.* Consequently, we remanded the plaintiff's case to the district court so that it could recruit counsel. Again, these cases did not articulate categorical rules, and, at best, serve as caution signs for the district court as it assesses the particular case before it. *Pruitt* did not overrule these cases, directly or by implication. Read in light of *Pruitt*'s reiteration of the deference owed the trial court on such matters, these cases simply continue to suggest that significant prudence and caution must be exercised when assessing a lay individual's capability for self-representation. The dissent's suggestion that our colleagues in the district court will read this case as placing a "thumb on the scale" in favor of recruitment, dissent at 37, misapprehends our holding and underestimates our colleagues on the district bench. We have no intention of undermining, *either directly or by implication*, the majority opinion in *Pruitt*.

With respect to the capabilities of the particular plaintiff, we have not developed categorical rules to make this assessment. The capability of each defendant is different; the facts of each case are also different. Therefore, "[t]he inquiry into plaintiff competence and case difficulty is particularized to the person and the case before the court." *Pruitt*, 503 F.3d at 656. While emphasizing that there are no "fixed requirements," we noted in *Pruitt* that a trial court normally will take into consideration the plaintiff's "literacy, communication skills, educational level, and litigation experience." *Id*. at 655. Intellectual capacity and psychological history, to the extent that they are known, are also relevant. The plaintiff's performance up to that point in the litigation

may be some evidence of these factors, but, in the end, the estimation as to whether a plaintiff can handle his own case must be "a practical one, made in light of whatever relevant evidence is available on the question." *Id.*

**3.**

With this guidance in mind and keeping in mind the deference that we owe the district court on this matter, we now turn to an evaluation of this case.

We first examine the nature of the case. Mr. Santiago's case cannot be characterized as a simple one. As amended, his complaint raises a total of seven constitutional claims against eight different defendants. Several claims are most properly characterized as Eighth Amendment failure to protect and deliberate indifference claims. To succeed in his claims for failure to protect at trial, Mr. Santiago was required to show that C.O. Ramage, C.O. Keys and Warden Walls knew that he faced a "substantial risk of serious harm" and then disregarded that risk "by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *accord Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). To prove that C.O. Jines, C.O. Cox and Dr. John Doe violated his Eighth Amendment rights by failing to provide medical care, Mr. Santiago needed to establish that those individuals acted with deliberate indifference. Both of these types of claims required that Mr. Santiago present relevant and probative evidence about the state of mind of the defen-

dants. As we have noted earlier, presenting this sort of evidence is one of the more challenging aspects of section 1983 litigation.

We next turn to the difficulty and overall complexity of this case in light of the plaintiff's litigation capabilities. *Pruitt*, 503 F.3d at 655. While dealing with the evidentiary demands of a case such as this one presents difficulties for many prisoner-plaintiffs, Mr. Santiago faced additional hurdles that must weigh heavily in a practical estimation of the situation that he faced. Because he had been transferred to another facility after the events underlying his claims, he faced significant problems that he would not have faced if he had remained in the same facility.[10] *See Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991) ("[P]laintiff is unable to investigate crucial facts because he currently is incarcerated in a facility different from that in which the alleged conduct took place."). Notably, in its order denying the appointment of counsel, the district court did not mention this very important factor. The fact that Mr. Santiago did not have ready access to any of the witnesses, documents or defendants certainly compounded his difficulty in engaging in the sort of pretrial discovery necessary to put on a credible case.[11] Yet, the district court apparently decided that the

---

[10] Mr. Santiago formally notified the court of his transfer by letter dated August 6, 2003 and received by the district court on August 11, 2003.

[11] *See* R.43 ("Plaintiff is in dire need of counsel to help assist in obtaining hundreds of documents, medical files, incident

(continued...)

assistance of counsel was unnecessary without considering this factor, much less giving it significant weight.

The omission of this consideration from the district court's calculus is especially significant in this particular case. Mr. Santiago was unaware of the names of some of the defendants and many of the witnesses. In another context, this court wrote most graphically of the quandary in which such lack of knowledge places an incarcerated defendant:

> Ordinarily a tort victim who does not know who the tortfeasor is cannot sue. To know that one has been injured tortiously but not by whom is a ground for tolling the statute of limitations, but it is not a ground for filing suit before the plaintiff knows who injured him and who therefore should be named as the defendants. But this is not an ordinary case. Billman is a prison inmate. His opportunities for conducting a precomplaint inquiry are, we assume, virtually nil. The state's attorney smiled when we asked him at argument whether Billman would be given the run of the prison to investigate the culpability of prison employees for the rape. Even without doing any investigating, Billman knew enough to know that a terrible thing had been done to him. But he did

---

[11] (...continued)
reports, grievances, to review camera footage of one of the incidents in question, and to locate, interview dozens of witnesses."); R.56 (stating that Mr. Santiago needed counsel to help secure camera footage of C.O. Keys's actions).

not know enough to identify the culprits or to determine whether they had the confluence of knowledge (of Crabtree's propensity for rape and HIV status) and power (to assign Billman to a cell) necessary to hold them liable for inflicting a cruel and unusual punishment.

We do not think that the children's game of pin the tail on the donkey is a proper model for constitutional tort law. If a prisoner makes allegations that if true indicate a significant likelihood that someone employed by the prison system has inflicted cruel and unusual punishment on him, and if the circumstances are such as to make it infeasible for the prisoner to identify that someone before filing his complaint, his suit should not be dismissed as frivolous. . . .

. . . Our point is that because Billman is a prisoner he may not be in a position to identify the proper defendants, or all of them, in his complaint. If he were not a prisoner, yet could not reasonably be expected to identify the wrongdoers without the aid of pretrial discovery, his suit would not be dismissed. . . . [H]e [was] not able to investigate before filing suit. We think it is the duty of the district court to assist him, within reason, to make the necessary investigation.

*Billman v. Ind. Dep't of Corrs.*, 56 F.3d 785, 789-90 (7th Cir. 1995) (citations and quotation marks omitted).

Mr. Santiago needed to prepare for trial on his own—a process that, given the intransigence of the prison officials—might well have required the preparation of

interrogatories and to take depositions so that he could determine whether any of the defendants had the requisite knowledge to give rise to an Eighth Amendment violation and to discover the identity of Dr. John Doe.[12] The district court observed that Mr. Santiago understood the facts of his case, because he was a witness to most of the relevant conduct. R.72. It further pointed out that he is literate and can follow the rules of procedure. *Id.* The court, however, failed to consider whether Mr. Santiago's litigation capabilities were sufficient for conducting the sort of discovery that was necessary in this particular case and under the unique and difficult circumstances of this case.

One further matter must be noted. In denying Mr. Santiago's motion for the appointment of counsel, the court made a definitive ruling that Mr. Santiago did not need counsel at the pretrial stage of the proceedings.[13] This determination, unlike its denial of earlier requests for the appointment of counsel, was

---

[12] The dissent's assertion that such discovery tools are not necessary in this case appears to be based on a categorical estimation of how prisoner civil rights claims ought to be tried rather than on a fair evaluation of this record. In the end, the question of how to proceed in discovery in the face of uncooperative public defendants is a matter best left to the plaintiff and his counsel under the supervision of the trial court. These matters are not susceptible to categorical pronouncements from an appellate perspective.

[13] "Plaintiff is competent to represent himself throughout the pretrial phase of this litigation." R.72 at 2.

articulated in definitive terms that would have made it clear to many attorneys, and certainly to Mr. Santiago, that the court did not intend to revisit the matter unless and until a trial was a significant likelihood. While the court well may have thought that it was time to end Mr. Santiago's requests, we also must be concerned as to whether such an approach prematurely deterred Mr. Santiago from renewing his request as he encountered strong headwinds in his later attempts to conduct discovery. While *Pruitt* makes clear that we cannot take into account post-request performance to determine whether the district court abused its discretion in denying a request for counsel, 503 F.3d at 656, we certainly can question, as we must here, whether the language of the district court in disposing of the matter impermissibly prevented Mr. Santiago from making later requests that would have been reviewable in this court.

We emphasize that the problem we discuss here is *not* the issue that divided some members of the court in *Pruitt*. There, a minority of the court expressed the belief that a trial judge has a continuing obligation to reassess whether a pro se litigant can proceed without counsel. Here, by contrast, we have the very different question of whether a trial judge ought to announce in advance that he will not return to the question, thus, as a practical matter, leaving the pro se litigant without recourse if the opposing party, free of judicial scrutiny, makes matters more difficult than the judge estimated they would become.

As we discuss at some length later, the court's announcement that it would not hear another request for appoint-

ment of counsel during pretrial matters was not lost on the defendants. Free from any accountability from the district court until trial, they saw no reason to be cooperative as Mr. Santiago struggled to collect the information needed at trial. *Pruitt* says that a district court need not revisit a request for counsel once it had made a decision on the matter. It did not say that a court could announce in advance that it would not, under any circumstances, entertain a new request no matter how a litigant was treated in the future. There is a world of difference, both theoretical and practical, between these two situations. The dissent's failure to acknowledge the importance of this difference constitutes an unwarranted attempt to expand *Pruitt* beyond the limitations set by the en banc court.

In assessing the peculiar circumstances of this case as revealed by our careful study of the record, we have kept in mind the great deference that we owe to the district court in this matter. However, review under an abuse of discretion standard is not the equivalent of no review at all, and scrutiny of the record for methodological lapses is well within the duty and the capability of an appellate court, as long as it confines itself to the record and omits from its estimations any predilections of its own. Here, we must conclude that the district court failed to take into consideration the peculiar circumstances of this case that made the pretrial phase of this litigation especially difficult for this particular plaintiff. This case presents an unusual confluence of circumstances—relatively difficult allegations to prove, confinement in another facility during trial preparation, the

inability to identify parties and witnesses, and a decidedly uncooperative prison administration who had the assurances of the magistrate judge that it would not have to worry about a lawyer being around during the discovery period. Undertaking discovery in this particular combination of circumstances made the playing field anything but level. This combination of circumstances may not always warrant the recruitment of counsel, but, on this record, the magistrate judge's methodological lapse in failing to give full consideration to each factor constitutes an abuse of discretion. The situation here is qualitatively different from typical prison litigation. Given the district court's failure to consider all these factors in evaluating Mr. Santiago's request for counsel, we must conclude that the district court deviated from the accepted approach to such a degree that we cannot let the judgment stand even under the deferential standard of review that we employ in these cases. Again, we do not, as the dissent charges, substitute our judgment for that of the trial court. We simply require that the district court consider all of the factors that the law requires it to consider in making its judgment.

**4.**

Our task is far from over. *Pruitt* makes clear that, even if we determine that the district court's denial of the appointment of counsel was an abuse of discretion, we should not reverse unless there has been a showing of prejudice. *See Pruitt*, 503 F.3d at 654. "[P]rejudice may

be established by a litigant's poor performance before or during trial." *Id.* at 659. This includes evidence from the record that "demonstrates that the pro se plaintiff was incapable of engaging in any investigation[] or locating and presenting key witnesses or evidence." *Id.* We engage in a totality-of-the-circumstances review of the proceedings to determine whether there is a reasonable likelihood that the presence of counsel would have altered the outcome in this case. *Id.* at 660.

We begin by noting that Mr. Santiago's later attempts to conduct relevant discovery were not successful. As we have chronicled in the early part of this opinion, although the district court apparently expected him to negotiate with prison officials with respect to his information needs, he hardly found a receptive, or cooperative, ear. The treatment afforded him by the defendants was not, it is safe to say, the same treatment that would have been afforded a member of the bar. As we also have noted earlier, the court's definitive disposition of his last motion for the appointment of counsel reasonably could have been interpreted as precluding reapplication during the pretrial discovery period.[14] The defendants

---

[14] The defendants submit that Mr. Santiago was not prejudiced by his lack of counsel, because the court-recruited counsel did not seek to reopen discovery. We disagree. Notably, the appointment of counsel was made "only for purposes of trial." R.173. Mr. Santiago's attorney made his first appearance on December 5, 2006—nearly two years after the close of discovery and three-and-a-half years after Mr. Santiago's com-

(continued...)

apparently interpreted the district court's order in that way, and Mr. Santiago came upon his trial date with little to show for his efforts.

Mr. Santiago clearly has established prejudice by virtue of his poor performance before and during trial. As foreshadowed by *Billman*, the district court was forced to drop Dr. John Doe as a defendant prior to trial because Mr. Santiago was unable to ascertain his identity. At trial, Mr. Santiago's only witness was Harris—the inmate who had threatened him. No witnesses to any of the assaults appear to have been found. Mr. Santiago's inability to identify key witnesses, depose the defendants and gather pertinent evidence such as the surveillance tapes hindered his ability to present his case. An attorney could have helped perform all of these tasks and would not have been deterred by the defendants' claim that inmate-witnesses were "not relevant." R.85, Ex. A at 2. We therefore must conclude that the assistance of counsel during discovery could have strengthened Mr. Santiago's case "in a manner reasonably likely to alter the outcome."[15]

---

[14] (...continued)

plaint was filed. The district court stated clearly that it believed Mr. Santiago was capable of completing discovery on his own and that counsel was necessary for trial purposes only. Because Mr. Santiago's counsel had no reason to believe that the court was willing to reopen discovery, we do not believe that his failure to seek additional discovery should bar Mr. Santiago from establishing prejudice.

[15] As we have noted, the dissent speculates that, despite the clear limitations we have expressed, our holding today will be

(continued...)

*Pruitt*, 503 F.3d at 660. Mr. Santiago has established the requisite prejudice.

Finally, we reiterate once again that the task we have undertaken is simply to apply well-established principles, including those recently articulated in *Pruitt*, to the record that has come before us in this case. Therefore, although the principles of law we articulate are well-established, our precise holding is limited to the facts and circumstances found in the record of this litigation. In that sense, our *holding,* like a special railroad fare, is limited "to this day and this train only."

---

[15] (...continued)
read by the district courts of this circuit as an instruction to "'move the exercise of discretion toward recruitment of counsel more often than not.'" Dissent at 48-49 (quoting *Pruitt*, 503 F.3d at 661). The consequence, according to the dissent, is the imposition of "a cost to the bench and bar alike." *Id.*

We reiterate once again that our decision today is not intended to place any "thumb on the scale," dissent at 37, of the reasonable exercise of discretion by the district court. It would be a gross misreading of our decision for any member of the bench or bar to read our decision as requiring anything more than adherence to principles of settled law.

The en banc decision in *Pruitt* ably balanced the interests at stake and set them forth in measured tones. We take this language at face value and take seriously the limited appellate task that it defines.

**Conclusion**

For the foregoing reasons, we affirm in part and reverse in part the judgment of the district court and remand this case for further proceedings consistent with this opinion. No costs shall be awarded in this court.

AFFIRMED in part;
REVERSED and REMANDED in part

SYKES, *Circuit Judge,* dissenting. I agree with my colleagues that the district court properly dismissed Count One of the complaint, in which Santiago alleged that Correctional Officers Rednour and Butler failed to protect him from Harris, a fellow inmate at the Menard Correctional Center. I also agree that the district court properly dismissed Count Two, which alleged that Sgt. Suemnicht and "C.O. John Doe" used excessive force in breaking up the fight between Harris and Santiago in the prison cafeteria. I disagree, however, with the decision to reinstate Count Four. That claim—alleging that Warden Walls failed to protect Santiago from an attack by his cellmate Castro—was also properly dismissed for reasons I will explain in a moment.

More significantly, I cannot agree that the district court abused its discretion by declining to recruit pro bono counsel for Santiago during discovery. In *Pruitt v. Mote,* 503 F.3d 647 (7th Cir. 2007) (en banc), we held that 28 U.S.C. § 1915(e)(1) places no thumb on the scale either

for or against recruiting volunteer counsel for an indigent litigant, either in general or in any particular category or type of case. *Id.* at 654. We also held that a district court's decision not to recruit counsel is entitled to substantial deference on appeal. *Id.* Unlike my colleagues, I see no abuse of discretion in the way in which the magistrate judge handled Santiago's various requests for recruited pro bono counsel during the course of this case. Accordingly, I respectfully dissent.

First, I disagree with the majority's conclusion to reinstate Count Four, which alleged that Warden Walls failed to protect Santiago from assault by Castro. As applicable here, this claim has the following two elements: (1) that Santiago was incarcerated under conditions posing a substantial risk of serious harm; and (2) that Warden Walls was deliberately indifferent to that risk, that is, that he personally knew of the risk and deliberately disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Pinkerton v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006). Santiago attached a copy of the grievance relevant to this claim as an exhibit to his complaint. Based on the contents of that grievance, he pleaded himself out of court.

The grievance is dated June 2, 2002—four days before Santiago's fight with Castro—and it was filed directly with the warden's office. In this grievance Santiago notably did *not* complain that he was at risk of serious harm from Castro, nor did he complain that Castro has a history of assaulting cellmates. Instead, he lodged a more general objection to his current cellmate—whom he did not name—and said that this inmate should have

been placed on his "enemies list." He also claimed that unnamed prison employees were retaliating against him by "placing me in cells with inmates they knew I wouldn't be able to live in the same cell with with [sic] the same intentions of provoking me into a physical confrontation and keeping me in the segregation unit." He contended further that these prison employees "continue to either provoke me into altercations of confrontation or place me into physical confrontations with other inmates." Finally, he said: "I am currently being housed with another inmate, dispite [sic] my numerous request [sic] for single cell."

Read generously, this grievance *at most* establishes that Warden Walls was aware that Santiago wanted a single cell to avoid being provoked into confrontations with cellmates he couldn't get along with and that his current cellmate should have been on his "enemies list" for unstated reasons. It also establishes that the warden was aware that Santiago accused unnamed prison employees of placing him in situations that would provoke him into altercations with other inmates and claimed these employees were motivated by a desire to keep him confined in the segregation unit. Importantly, the grievance does *not* say Santiago feared being attacked by his cellmate. Instead, Santiago complained that *he* might be "provoked" into assaulting his cellmate or another inmate. Based on the contents of this grievance, Santiago cannot prevail. As a matter of law, Warden Walls cannot have been deliberately indifferent to a risk that Santiago would be attacked by his cellmate when the grievance in question alerted the warden to an entirely different

sort of risk—a risk that Santiago *himself* might attack another inmate.

There is an additional reason not to reinstate this claim. Although Santiago alleged in his complaint that *Castro* attacked *him*, at trial he told quite a different story—one more consistent with the contents of the grievance. He testified that he and Castro were having a heated argument about flushing the toilet in their cell, that the argument escalated, and that he—Santiago—threw the first punch. A full-blown fight ensued and he got the worst of it, sustaining various injuries. In my judgment, on remand the warden would be entitled to summary judgment based on Santiago's trial testimony. Santiago cannot recover on his claim that the warden was deliberately indifferent to a risk of harm from Castro when *Santiago himself* started the fight. I would affirm the dismissal of Count Four.

This brings me to the majority's reversal of the district court's decision not to recruit pro bono counsel until the time of trial. In *Pruitt* this court sat en banc to clarify the legal standards that guide the district court's exercise of discretion when confronted with a request for recruitment of pro bono counsel under 28 U.S.C. § 1915(e)(1). We held that when an indigent plaintiff requests counsel under § 1915(e)(1), the district court must make the following inquiries: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt*, 503 F.3d at 654. We further held

that "[a]lthough [§ 1915(e)(1)] 'legitimizes' the court's request for a pro bono lawyer, its language suggests no congressional preference for recruitment of counsel in any particular circumstance or category of case." *Id.* (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006)).

We also addressed the separate question of the appellate standard of review, emphasizing that appellate review—for abuse of discretion only—is limited and highly deferential. "As with any discretionary determination, the question on appellate review is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision on facts supported by the record." *Id.* at 658.

The majority notes the district-court and appellate standards from *Pruitt* but essentially undertakes a wholly independent analysis of Santiago's request for pro bono counsel, requiring recruitment of counsel during the discovery phase of this case for basically two reasons: (1) Santiago's claims require proof that prison officials were deliberately indifferent to a risk to his safety; and (2) Santiago had been transferred to another prison by the time he filed his lawsuit. The first of these factors is present in many prisoner cases; as such, the majority's holding could be understood to suggest a general rule requiring pro bono counsel in deliberate-indifference cases. The second factor is also not uncommon and is not significant enough to warrant reversal of the magistrate judge's discretionary decision.

Our decision in *Pruitt* specifically addressed the limited nature of the appellate role in reviewing a district court's decision not to recruit pro bono counsel: "[W]e do not undertake our own analysis of the degree of case difficulty as against the plaintiff's competence to litigate it himself; that is the district court's inquiry, not ours." *Id.* We emphasized the district court's superior position to evaluate requests for pro bono counsel and reiterated that the reviewing court's inquiry asks *only* whether the court's decision was reasonable: "'We ask not whether [the judge] was right, but whether he was reasonable.'" *Id.* at 659 (quoting *Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir. 1993) (alteration in original)). Properly focused, then, appellate review of decisions declining to recruit counsel under § 1915(e)(1) will result in reversal only in the rare case where the district court's decision is based on an error of law or clearly erroneous factfinding, or is arbitrary or irrational. *Id.* at 658.

The magistrate judge's decision here suffers from none of these infirmities. Though he decided the matter before *Pruitt* was issued, the judge touched all the bases. First, he specifically addressed the nature of Santiago's claims—excessive force, failure to protect, insufficient medical care, and retaliation—and concluded they were not overly complex in the circumstances of this case. The judge then evaluated Santiago's capabilities and the resources available to him in prison, as *Pruitt* requires. The judge noted that Santiago is literate, understood the nature of his claims, and had demonstrated the ability to "comprehend and follow rules of procedure." The judge further noted that Santiago had "personal knowl-

edge of the relevant facts" and reasonable access to documents, postal services, a library and legal materials, and photocopying services. The judge reserved judgment about whether Santiago would be competent to *try* his own case but concluded that he was competent to handle the "pretrial phase of this litigation." However strongly my colleagues may disagree with this decision, nothing in the judge's reasoning reflects an abuse of discretion.

As I have noted, the majority has focused on essentially two factors: (1) the supposed complexity of proving deliberate indifference; and (2) the fact that Santiago had been moved to a different prison by the time he filed his case. Taken individually, neither of these factors justifies reversal under our deferential standard of review; nor are they enough considered together to call into question the magistrate judge's exercise of discretion.

Santiago's case included claims of excessive force, failure to protect, delayed or insufficient medical care, and retaliation, all stemming from two fights in the prison. I do not agree that the state-of-mind elements in these claims are either inherently complex or uniquely difficult in the circumstances of this case.[1] Each defendant's

---

[1] The cases the majority cites—*Swofford v. Mandrell*, 969 F.2d 547 (7th Cir. 1992); *Merritt v. Faulkner*, 697 F.2d 761 (7th Cir. 1983)—predate *Pruitt* and must be read in light of the principles explained in our en banc decision. To the extent these cases suggest deliberate-indifference claims are inherently too

(continued...)

state of mind is inferred primarily from the circumstances surrounding the assaults in question and the grievances Santiago filed alerting prison officials to his complaints about Harris and Castro. As the magistrate judge properly noted, Santiago had personal knowledge of these facts and circumstances and did not require assistance of counsel to discover them.

The majority concludes that Santiago was incapable of conducting discovery on his own—in particular, that he was incapable of preparing interrogatories and taking depositions "so that he could determine whether any of the defendants had the requisite knowledge to give rise to an Eighth Amendment violation and to discover the identity of Dr. John Doe." Maj. op. at 30. The identity of Dr. John Doe was obtainable by simple interrogatory or document request; nothing in the record suggests Santiago was incapable of submitting such a straightforward question to the defendants himself. And I am hesitant to conclude from our appellate-court vantage point that this case required depositions to probe state-of-mind issues. It bears repeating that it is the *district court's* prerogative—not ours—to determine whether a pro se litigant is generally capable of navigating pretrial discovery under the particular circumstances of the case. Although my colleagues disagree with the magistrate judge's assessment of Santiago's competence to handle

---

[1] (...continued)

complex for an indigent pro se litigant, they have been superseded by *Pruitt.*

the pretrial preparation of his case, the judge's decision was hardly *unreasonable*—and *that* is the appropriate question on appellate review. *See Jackson v. Kotter*, 541 F.3d 688, 700 (7th Cir. 2008) (applying *Pruitt* and deferring to the district court's decision declining to recruit counsel in a case involving similar allegations of excessive force, deliberate indifference, and inadequate medical care).

It is true the magistrate judge did not consider the fact that during the pendency of his case, Santiago was incarcerated at a prison other than Menard, where the events at issue took place. It is not clear why this should make any difference, let alone a difference significant enough to displace the magistrate judge's decision. The majority does not explain why a prisoner's incarceration at a different prison makes discovery inherently more difficult. With the exception of depositions, discovery is conducted largely through written requests; depositions are initiated upon written notice and, to the extent they are necessary, obviously need not be conducted at the place where the events at issue in the litigation occurred. The magistrate judge specifically considered Santiago's capabilities and the resources available to him, noting he was literate and had access to documents, postal services, a law library, and photocopying services to assist him in preparing his discovery requests. In my view, the judge's failure to separately address Santiago's incarceration at a different prison is not significant enough to warrant reversal under our deferential standard of review.

The majority also takes issue with the magistrate judge's language in his order denying Santiago's fourth

motion for counsel, suggesting it "impermissibly pre-vented Mr. Santiago from making later requests that would have been reviewable in this court." Maj. op. at 31. With respect, I find this criticism of the judge particularly unwarranted. We held in *Pruitt* that the district court has no duty to monitor whether an indigent litigant is competently litigating his claims throughout the litiga-tion and therefore no obligation to revisit an earlier denial of pro bono counsel. *Pruitt*, 503 F.3d at 658. We acknowledged, however, that the court has the *discretion* to proceed incrementally on this question if it chooses, *id.*, and that's exactly what the judge did here. The judge held that Santiago was "competent to represent himself throughout the pretrial phase of this litigation" but that his skills "may not suffice at trial," and on this basis denied Santiago's request for pro bono counsel "without prejudice to his right to seek representation for purposes of trial." The judge later recruited pro bono counsel to represent Santiago at trial.

The majority faults the judge for using the language I have quoted, saying it was too "definitive" and may have inhibited further requests for counsel during dis-covery. Maj. op. at 30-31. This is highly doubtful. Prison inmates generally are not shy about filing motions and are not often deterred by concerns about trying the court's patience. More importantly, the majority has effectively suggested that the district court *must* proceed incrementally on the question of recruitment of counsel, *always* keeping the matter open for further review at *any* point along the way. We specifically held in *Pruitt* that there is no such rule. 503 F.3d at 656-58.

Finally, a few words about the majority's prejudice analysis. The majority notes that the claim against Dr. John Doe was dismissed prior to trial because Santiago could not identify him and suggests this is evidence of prejudice. As I have already explained, there was nothing that prevented Santiago from discovering the doctor's identity. All it took was a simple interrogatory question or document request; assistance of counsel was not required for that. The majority also concludes that Santiago's inability to locate other witnesses to the assaults and "gather pertinent evidence such as the surveillance tapes" hampered his ability to present his case. Maj. op. at 35. But it's important to focus on the crux of the claims that actually went to trial. Four counts survived screening and proceeded to trial: Count Three, against Correctional Officer Keys for allegedly yanking on Santiago's handcuffs while escorting him from the infirmary to segregation after the fight with Harris; Count Five, against Warden Walls for allegedly failing to protect Santiago by housing him in the same cell block as Harris; Count Six, against Correctional Officers Jines and Cox for allegedly failing to provide medical treatment after the Castro assault; and Count Seven, against Walls and Keys for retaliation. Notably, *none* of these counts involved a dispute between the parties about the basic facts of either the fight between Santiago and Harris *or* the fight between Santiago and Castro. Rather, the dispute centered on what happened *before* and *after* the fights, and the witnesses to these events were Santiago and the defendant prison officials. Accordingly, identifying additional witnesses would not have made a difference.

As for the "surveillance tapes," there is nothing in the record to suggest that anything relevant to the surviving counts was captured on surveillance videotape. Santiago believes there was a surveillance camera on the route from the prison cafeteria (where the fight with Harris occurred) to the infirmary and also across from a holding cell outside the segregation unit. The record does not substantiate this. It is not, in any event, enough to establish prejudice, which requires "a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation." *Pruitt*, 503 F.3d at 659. Speculation that surveillance videotape *might* exist (seven years after the fact) and *might* contain relevant evidence is simply too slim a reed to support a finding of prejudice.

In the end, I return to a concluding point we made in *Pruitt*:

> The principles reiterated here are intended to ensure that requests for pro bono counsel are resolved according to a consistent framework calibrated to the nature of the discretionary judgment called for by § 1915(e)(1). *They are not meant to move the exercise of discretion toward recruitment of counsel more often than not, or more often than is now the case*; we repeat that the inquiry is individualized to the plaintiff and the case before the court.

*Id.* at 661 (emphasis added). For the reasons I have explained, the majority's decision in this case may have the effect of suggesting to our district judges that they had better "move the exercise of discretion toward re-

cruitment of counsel more often than not" and "more often than is now the case." *Id.* This will come at a cost to the bench and bar alike and was manifestly *not* what we intended in *Pruitt*. For all the foregoing reasons, I would affirm the judgment of the district court.